THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| ALFWEAR INC.,<br><br>        Plaintiff,<br><br>v.<br><br>IBKUL CORP. and IBCOOL INC.,<br><br>        Defendants. | **MEMORANDUM DECISION AND ORDER**<br>• **GRANTING IN PART AND DENYING IN PART [ECF NO. 120] PLAINTIFF'S MOTION TO EXCLUDE**<br>• **GRANTING IN PART AND DENYING IN PART [ECF NO. 123] PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br>• **GRANTING IN PART AND DENYING IN PART [ECF NO. 126] DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br>• **DENYING [ECF NO. 127] DEFENDANTS' MOTION TO EXCLUDE**<br><br>Case No. 2:21-cv-00698-DBB-DBP<br><br>District Judge David Barlow |

Before the court are Plaintiff Alfwear, Inc.'s ("Alfwear") and Defendants IBKUL Corp. and IBCOOL, Inc.'s (together "Ibkul") competing motions to exclude each other's expert reports and for summary judgment. Alfwear moves to exclude the report of Ibkul's expert, Krista F. Holt ("Ms. Holt").[1] Ibkul moves to exclude the report of Alfwear's expert, Rhonda Harper ("Ms.

---

[1] Plaintiff's Motion to Exclude Krista F. Holt's Expert Report ("Pl. Exp. Mot.'), <u>ECF No. 120</u>, filed Oct. 11, 2024.

1

Harper").[2] Alfwear moves for partial summary judgment that it has a protectable interest in its trademarks and on Ibkul's affirmative defenses,[3] while Ibkul moves for summary judgment on Alfwear's trademark infringement and dilution claims.[4]

## BACKGROUND

Alfwear is an outdoor clothing company that sells products under the KÜHL mark.[5] "KÜHL" is the German translation for "cool" and was selected as Alfwear's mark to persuade customers that its products were "cool" because they are interesting and exclusive and "cool" because they can be used to regulate the wearer's temperature.[6] Alfwear has used the KÜHL mark since 1994 for its apparel line and other products.[7] Alfwear registered the KÜHL trademark in 1996 for "rugged outdoor clothing" including "jackets, shirts, pants, shorts, t-shirts, and hats."[8]



Alfwear trademarked a capitalized version of the KÜHL mark in 2011 (the "2011 mark").[9]

---

[2] Motion to Exclude Testimony and Opinions of Plaintiff's Survey Expert Rhonda Harper ("Def. Exp. Mot."), ECF No. 127, Oct. 11, 2024.
[3] Plaintiff's Motion for Summary Judgment ("Pl. MSJ"), ECF No. 123, filed Oct. 11, 2024.
[4] Defendants' Motion for Summary Judgment ("Def. MSJ"), ECF No. 126, filed Oct. 11, 2024.
[5] Amended Complaint ¶ 49, ECF No. 28, filed Mar. 28, 2022.
[6] Deposition of Kevin Boyle 108:23–25 (Kuhl is the German translation for cool); 119:1–8 ("what makes something cool is because not everybody has it."); 172:2–8 ("cool has a different connotation and double meaning, and that's what makes the whole KÜHL trademark so powerful"), ECF No. 125-6, filed Oct. 11, 2024.
[7] Amended Complaint ¶ 49.
[8] U.S. Trademark Registration No. 1,990,375, registered July 30, 1996, ECF No. 28-1, filed Mar. 28, 2022.
[9] U.S. Trademark Registration No. 3,916,866, registered Feb. 8, 2011, ECF No. 123-2, filed Oct. 11, 2024.

# KÜHL

KÜHL products often feature an insignia of a snow-covered mountain inside a shield-shaped emblem, which Alfwear has had trademarked since 2007 (the "Mountain Logo").[10]



KÜHL products also frequently feature the "BORN IN THE MOUNTAINS" mark, which Alfwear trademarked in 2009.[11] KÜHL sell products in both solid colors and prints, as displayed in its Spring 2023 catalog.[12]

    

---

[10] U.S. Trademark Registration No. 3,257,143, registered June 26, 2007, ECF No. 128-24, filed Oct. 11, 2024.
[11] U.S. Trademark Registration No. 3,572,281, registered Feb. 10, 2009, ECF No. 128-25, filed Oct. 11, 2024.
[12] KÜHL Spring 2023 Catalog ("KÜHL Catalog"), ECF No. 130-4, filed Oct. 11, 2024.

3

KÜHL apparel is sold for around $100 per item, with the most expensive items retailing for over $300.[13] Alfwear sells KÜHL brand products at retailers throughout the United States, including REI, Scheels, and Sierra Trading Post.[14] It also sells products through its own website, which displays individuals doing outdoor activities while wearing KÜHL clothing.[15]



Ibkul is a clothing company specializing in athleisure wear.[16] Ibkul was started under the name Iccicles as a women's clothing company in 2014.[17] Anurag Gauba ("Mr. Gauba"), Ibkul's CEO, and Jamie Handler ("Mr. Handler"), Ibkul's President, changed the company's name to Ibkul in 2016 to highlight the clothing's cooling technology and appeal to the men's clothing market.[18] Mr. Gauba and Mr. Handler asked a designer to generate a logo for Ibkul, and they selected a logo with an umlaut and "smiley face" design.[19]

[13] Kuhl Pricing Sheet, ECF No. 148-15, filed Nov. 8. 2024.
[14] List of KHLs Retailers, ECF 148-16, filed Nov. 8, 2024.
[15] KHLs Website, ECF No. 146-61, filed Nov. 8, 2024.
[16] Anurag Gauba Deposition 85:3–10 ("Gauba Dep."), ECF No. 125-4, filed Oct. 11, 2024.
[17] Gauba Dep. 40:9–21; 42:1–7; Jamie Handler Deposition 43:14–17 ("Handler Dep."), ECF 128-20, filed Oct. 11, 2024.
[18] Gauba Dep. 40:9–21; 42:1–7.
[19] Handler Dep. 46:13–19.



Ibkul sells clothing in both solid colors and prints, as shown in its Spring 2023 product catalog.[20] Ibkul states that its sales are driven by its unique, copyrighted prints.[21] However, a significant percentage of Ibkul clothing is sold in solid colors.[22]



---

[20] D. 2023 Spring Catalog ("IBKÜL Catalog"), ECF No. 128-3, filed Oct. 11, 2024.
[21] Def. MSJ 10.
[22] The record offers different accounts of how much of Ibkul's sales come from solid colors or prints. In Jamie Handler's Rule 30(b)(6) deposition, he stated that solid colors make up about 70 percent of Ibkul sales. *See* Deposition of Jamie Handler, Rule 30(b)(6) Witness for Ibkul Wholesale, 26:12-18, ECF No. 148-6, filed Nov. 8, 2024. Ibkul now disputes that characterization, arguing that solid colors made up 42 percent of their 2023 sales. *See* Reply Declaration of Anurag Gauba in Support of Defendants' Motion for Summary Judgment 2, ECF No. 165, filed Nov. 24, 2024.

5

Ibkul clothing sells for an average retail price of $100 per item.[23] It sells these items at retailers throughout the United States, most of which are "green grass" retailers such as country clubs and golf resorts.[24] Ibkul also sells its products on its website, which displays its products and logo.[25]



Ibkul's website also features its clothing collections for specific activities, such as golf, tennis, yoga, and equestrian activities.[26]

COLLECTIONS

## ELEVATE YOUR PERFORMANCE






**Golf Collection** ›
Perfect your swing with our high-performance golf apparel. Elevate your game with style and comfort on the greens.

**Tennis Collection** ›
Serve up style and agility with our tennis collection. Stay cool and move freely for winning performances.

**Yoga Collection** ›
Embrace tranquility and flexibility with our yoga collection. Experience comfort and support during your practice.

**Equestrian Collection** ›
Ride in style and comfort with our equestrian line. Designed for performance and elegance in the saddle.

---

[23] Rebuttal Expert Report of Krista F. Holt 33, <u>ECF No. 122-1</u>, filed Oct. 11, 2024.
[24] Declaration of Jamie Handler Re: Screening Questions in Plaintiff's Survey 2, <u>ECF 130-6</u>, filed Oct. 11, 2024.
[25] Defendants' Website Regarding Mountains and Layering, <u>ECF No. 146-26</u>, filed Nov. 8, 2024.
[26] *Id.*

Ibkul filed for trademark protection for the IBKÜL mark on September 29, 2016.[27] Ibkul started selling products with the IBKÜL mark in November 2016.[28] Ibkul states that it first became aware of Alfwear and the KÜHL mark around October 31, 2016, after Alfwear opposed its application for trademark protection for the IBKÜL mark.[29]

Alfwear opposed registration of the IBKÜL mark before the Trademark Trial and Appeal Board ("TTAB").[30] On June 2, 2020, the TTAB sustained Alfwear's opposition on the ground that the KÜHL and IBKÜL marks were likely to be confused.[31] As part of this ruling, the TTAB found that "the KÜHL trademark for clothing has achieved moderate commercial strength, but the evidence falls short of clearly establishing that the mark is famous."[32] Ibkul appealed this decision to the Court of Appeals for the Federal Circuit, which vacated and remanded the decision on October 13, 2021.[33]

In November 2021, Alfwear initiated this lawsuit against Ibkul, alleging trademark infringement, unfair competition, and dilution.[34] On April 29, 2024, the court entered an Amended Scheduling Order stating when the parties had to disclose their experts and provide their reports.[35] The parties were ordered to disclose any experts on June 28, 2024, and counter experts on August 2, 2024. On June 28, 2024, Alfwear disclosed that it intended for Ms. Harper to serve as an expert "regarding research surveys, consumer confusion, and likelihood of

---

[27] Second Supplemental Responses to Plaintiff's First Set of Interrogatories 9, ECF No. 128-27, filed Oct. 11, 2024.
[28] *Id* at 3; Deposition of Anurag Gauba 32:6–8, ECF No. 148-3, filed Nov. 8, 2024.
[29] Second Supplemental Responses to Plaintiff's First Set of Interrogatories 5, ECF No. 128-27, filed Oct. 11, 2024; Deposition of Anurag Gauba 147:1–6, ECF No. 148-3, filed Nov. 8, 2024.
[30] *Alfwear, Inc. v. Ibkul Ubhot Ltd.*, No. 91233985, 2020 WL 3429163, at *1 (June 2, 2020).
[31] *Id.* at 18.
[32] *Id.* at 16.
[33] *IBKUL UBHOT LTD. v. Alfwear, Inc.*, No. 2020-2120, 2021 WL 4772792, at *1 (Fed. Cir. Oct. 13, 2021).
[34] Complaint, ECF No. 2, filed Nov. 28, 2021.
[35] Amended Scheduling Order, ECF No. 105, filed April 29, 2024. Subsequent Amended Scheduling Orders did not alter the dates for expert disclosures. *See* Amended Scheduling Order, ECF No. 111, filed June 23, 2024.

confusion. Such evidence may also be offered in support of damages issues in the case."[36] On August 2, 2024, Ibkul disclosed that Ms. Holt would "serve as an expert in response to Plaintiff's Expert Disclosures, including the general subject matter of 'research surveys, consumer confusion, and likelihood of confusion' and 'damages issues,' including any deductions and apportionment."[37]

## I.    Harper Report

As part of its litigation strategy, Alfwear hired Rhonda Harper to determine whether consumers would confuse the IBKÜL mark with the KÜHL mark.[38] Ms. Harper is the owner and manager of Harper Litigation Consulting and Research.[39] She has worked in marketing and communications, including designing research studies into consumer beliefs about brands.[40]  Ms. Harper has conducted hundreds of consumer research studies and has been retained as an intellectual property infringement survey expert more than 100 times.[41] Ms. Harper was asked "to conduct a forward likelihood of confusion survey among the relevant population and provide [her] opinions."[42]

Ms. Harper utilized a Squirt-style sequential line-up study to evaluate whether consumers would confuse the KÜHL and IBKÜL marks (the "Confusion Survey").[43] This online survey was programmed and hosted by Research Results, a company that specializes in web survey

---

[36] Plaintiff's Expert Disclosures, ECF No. 145-1, filed Nov. 8, 2024.
[37] Defendants' Expert Disclosures, ECF No. 120-3, filed Oct. 11, 2024.
[38] Expert Survey Report of Rhonda Harper 10 ("Harper Report"), ECF No. 128-1, filed Oct. 11, 2024.
[39] *Id.* at 4.
[40] *Id.* at 7.
[41] *Id.* at 12.
[42] Harper Report 3.
[43] *Id.* at 15.

programs.[44] The survey was double-blinded, as respondents were not informed what the purpose of the survey was or who sponsored it.[45] The survey also had quality control items including a "Captcha" question to ensure respondents could participate, an attention check question to ensure participants were focused on the survey, and a requirement that respondents did not leave the survey's browser during the survey.[46]

The questionnaire had two components. First, respondents went through a screener questionnaire to determine if they fit into the relevant universe. Ms. Harper worked with Prodege/PEEQ and Pure Spectrum to supply the sample population for the survey.[47] Ms. Harper determined that the relevant universe for the study, or the segment of the population whose perceptions are relevant to the case, are "past and potential purchasers of Defendants' products."[48] Ms. Harper screened survey participants to ensure they fit the relevant universe by asking if they had purchased or would purchase the type of clothing Ibkul sells, shop at retailers that sell Ibkul products, and would pay the price of Ibkul's products.[49] If respondents did not satisfy the universe definition, they were eliminated from the study.[50]

The survey had 395 qualified completers.[51] Thirty-five percent of qualified completers were between 18 and 34 years old, thirty-eight percent were between 35 and 54, and twenty-six percent were 55 or older.[52] Qualified completers were evenly split on gender.[53] Qualified

---

[44] *Id.* at 24.
[45] *Id.*
[46] *Id.* at 25.
[47] *Id.* at 15.
[48] *Id.* at 13.
[49] *Id.*
[50] *Id.* at 19.
[51] *Id.* at 15.
[52] *Id.* at 20.
[53] *Id.*

completers were also spread throughout the United States, with seventeen percent from the Northeast, twenty-one percent from the Midwest, twenty-five percent from the West, and thirty-eight percent from the South.[54]

The main questionnaire focused on respondents' identification of the IBKÜL mark.[55] To test whether the parties' trademarks were likely to be confused, Ms. Harper used the image of a KÜHL hang tag that consumers would see attached to a garment in a retail store.[56] The hang tag used in the survey features the KÜHL trademark and Mountain Logo.



Qualified respondents were shown the KÜHL hang tag for at least five seconds with the instruction to imagine they were shopping for apparel and saw the tag, which the survey defined as "Hang Tag A."[57] After a respondent indicated that they had clearly seen the hang tag they were given a decoy or "palate cleanser" question to "put time and space" between the KÜHL mark and the rest of the test.[58] Survey participants were then split into a test group and a control group.

---

[54] *Id.* at 21.
[55] *Id.*
[56] *Id.* at 17.
[57] *Id.* at 21.
[58] *Id.*

Survey participants in the test group were shown an Ibkul hang tag, featuring the U logo and IBKÜL mark.[59]



Survey participants in the control group were shown a hang tag for the fictitious company IBSET. This fictitious tag shared similarities with the IBKÜL tag, featuring similar colors and the "smiley face" logo. However, it changed the brand name and tagline to test whether respondents were responding to these elements.[60]



---

[59] *Id.* at 18.
[60] *Id.*

Respondents were asked if the control or test hang tags were from the same brand as the KÜHL hang tag, a different brand from the KÜHL hang tag, or if they had no opinion or did not know.[61] Respondents who answered that the hang tags were from the same or different brands were also asked why they selected that answer in an open-ended question.[62] Respondents were then shown a hang tag from another activewear brand and asked whether it was from the same or a different brand as Hang Tag A.[63]

The survey found that 53.8 percent of the qualified completers who saw the test IBKÜL hang tag were likely to be confused as to whether the IBKÜL mark came from the same company or was affiliated with KÜHL.[64] The survey also found that 36.7 of the relevant universe was confused as to the fictitious IBSET mark.[65] Ms. Harper used these numbers to calculate a net confusion rate of 17.1 percent.[66] Based on these results, Ms. Harper concluded that there is a likelihood of forward confusion with respect to the KÜHL mark.[67] Ms. Harper's report does not offer a calculation of damages or an opinion as to the fame of the KÜHL mark.

## II.    Holt Report

IBKUL responded to the Confusion Survey by hiring Krista Holt to prepare a rebuttal expert report (the "Holt Report").[68] Ms. Holt is a director at a research and consulting firm with experience in damages, intellectual property, surveys, statistical analysis, and valuation.[69] She

---

[61] *Id.* at 22.
[62] *Id.* at 23.
[63] *Id.* at 57.
[64] *Id.* at 28.
[65] *Id.*
[66] *Id.* at 27.
[67] *Id.* at 28.
[68] Rebuttal Expert Report of Krista F. Holt ("Holt Report"), ECF No. 122-1, filed Oct. 11, 2024.
[69] *Id.* at 1.

has also worked as a litigation consultant and in accounting and marketing management.[70] Ms. Holt has provided survey services in intellectual property disputes for over fifteen years, including designing and rebutting confusion surveys.[71]

Ms. Holt was asked by IBKUL to serve as an expert in response to Alfwear's expert, including the general subject matter of research surveys, consumer confusion, and the likelihood of confusion. Ms. Holt was also asked to serve as an expert on damages issues "including any deductions and apportionment."[72] Her report includes opinions on three topics.

First, Ms. Holt offers a study she conducted in separate litigation. Ms. Holt was previously retained by another defendant in a different case to assess the fame of the KÜHL mark (the "Fame Survey").[73] Ms. Holt conducted an online survey of 394 respondents from the general public in 2020, which indicated that consumers do not consider KÜHL to be famous.[74] Ms. Holt states that these survey results are as reasonable in 2024 as they were when the survey was conducted in 2020.[75]

Ms. Holt then responds to the Confusion Survey, arguing that the survey is "fatally flawed" for several reasons.[76] Ms. Holt argues that the use of hang tags created a "highly distorted, hypothetical marketplace" that does not replicate actual marketplace conditions.[77] She states that the parties sell in different locations and product categories, so the use of hang tags does not capture how the products would appear to consumers. Ms. Holt then argues that Ms.

---

[70] *Id.*
[71] *Id.* at Appendix A 1.
[72] *Id.* at 2.
[73] *Id.*
[74] *Id.* at 3.
[75] *Id.* at 23.
[76] *Id.* at 24.
[77] *Id.* at 25, 28.

Harper has surveyed the wrong universe of potential customers.[78] Ms. Holt also critiques the Confusion Survey's methodology, claiming it used leading and biased questions and contains methodological errors.[79]

Finally, Ms. Holt offers an estimate of damages.[80] Ms. Holt calculated damages under the assumption that Ibkul's products are infringing and gives an estimate based on its profits from 2019 to 2023.[81]

## EXPERT WITNESS STANDARD

Federal Rule of Evidence 702 "imposes upon the trial judge an important 'gate-keeping' function with regard to the admissibility of expert opinions."[82] It provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.[83]

"To determine whether an expert opinion is admissible, the district court performs a two-step test. First, the court must determine whether the expert is qualified by 'knowledge, skill, experience, training, or education' to render an opinion. Second, if the expert is sufficiently qualified, the court must determine whether the expert's opinion is reliable."[84] "The proponent of

---

[78] *Id.* at 32.
[79] *Id.* at 39.
[80] *Id.* at 45.
[81] *Id.* at 56.
[82] *Mathis v. Huff & Puff Trucking, Inc.*, 787 F.3d 1297, 1307 (10th Cir. 2015) (quoting *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 969 (10th Cir. 2001)).
[83] Fed. R. Evid. 702.
[84] *103 Invs. I, L.P. v. Square D Co.*, 470 F.3d 985, 990 (10th Cir. 2006) (quoting Fed.R.Evid. 702).

expert testimony bears the burden of showing that its proffered expert's testimony is admissible."[85]

## DISCUSSION

The parties move to exclude each other's expert under Rule 702. The court first addresses whether Ibkul's rebuttal expert, Ms. Holt, should be excluded. The court then addresses whether Alfwear's expert, Ms. Harper, should be excluded.

### I.    Ibkul Expert Ms. Holt

Alfwear contends that portions of Ms. Holt's expert report should be excluded on three bases. First, it argues that Ibkul failed to disclose Ms. Holt at the deadline for affirmative experts, so the portions of her report that go beyond the scope of the Harper Report should be excluded. Next, it argues that Ms. Holt is not qualified to offer opinions on marketing. Finally, Alfwear argues that Ms. Holt used the wrong standard to critique Ms. Harper's methodology. The court considers each argument in turn.

### A.  Rule 26

Alfwear argues that two portions of the Holt Report should be excluded for failure to comply with the Rules of Civil Procedure. First, it argues that the Fame Study in the Holt Report should be excluded because Ms. Holt was designated as a rebuttal expert on topics that did not include the fame of any of Alfwear's marks.[86] Second, it argues that Ms. Holt's opinions about damages should be excluded because Ms. Holt was not timely disclosed as a damages expert and

---

[85] *United States v. Nacchio*, <u>555 F.3d 1234, 1241</u> (10th Cir. 2009) (citing *Ralston*, <u>275 F.3d at 970 n.4</u> ).
[86] Pl. Exp. Mot. 9.

because the Harper Report does not address damages.[87] Alfwear argues that these failures were not justified or harmless, so this testimony should be excluded.[88]

Federal Rule of Civil Procedure 26 requires parties to disclose expert testimony "at the times and in the sequence that the court orders."[89] Expert disclosures must contain a "complete statement of all opinions the witness will express and the basis and reasons for them."[90] Rule 37 then provides that if "a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."[91] The rules thus impose a "duty to disclose information regarding expert testimony sufficiently in advance of trial so that opposing parties have a reasonable opportunity to prepare for effective cross examination and perhaps arrange for expert testimony from other expert witnesses."[92]

Expert reports "are intended not only to identify the expert witness, but also 'to set forth the substance of the direct examination.' Such disclosure is necessary to allow the opposing party 'a reasonable opportunity to prepare for effective cross examination and perhaps arrange for expert testimony from other witnesses.'"[93] "The function of rebuttal testimony is to explain, repel, counteract, or disprove evidence of the adverse party. As such, rebuttal evidence may be

---

[87] *Id.* at 10–11.
[88] *Id.* at 11.
[89] Fed. R. Civ. P. 26 (a)(2)(D).
[90] Fed. R. Civ. P. 26 (a)(2)(B)(i).
[91] Fed. R. Civ. P. 37 (c)(1).
[92] *ClearOne Commc'ns, Inc. v. Biamp Sys.*, 653 F.3d 1163, 1176 (10th Cir. 2011) (quoting Fed. R. Civ. P. 26(a)(2) Advisory Committee's Note (1993)).
[93] *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 953 (10th Cir. 2002) (quoting Fed.R.Civ.P. 26(a)(2) advisory committee note (1993)).

used to challenge the evidence or theory of an opponent—and not to establish a case-in-chief."[94] "Rebuttal expert reports are not the proper place for presenting new arguments."[95]

Alfwear argues that the Fame Survey should be excluded because it goes beyond the scope of the Harper Report.[96] Ms. Harper was not designated to testify about the fame of any Alfwear mark, and her report does not state an opinion on whether the KÜHL mark is famous. Therefore, the inclusion of the Fame Survey and Ms. Holt's opinions about it are not responsive to Ms. Harper and are improper rebuttal testimony.

Ibkul argues that the Fame Survey is responsive because Ms. Holt was designated as an expert on research surveys and consumer confusion.[97] But the Holt Report does not mention the fame of the KÜHL mark. The Harper Report's survey on consumer confusion and opinions drawn from the survey do not invite the introduction of another study from a separate case evaluating the fame of the KÜHL mark. The Fame Survey is not responsive to the Harper Report and cannot be introduced as rebuttal testimony. Therefore, it should be excluded unless Ibkul's failure to disclose Ms. Holt as an affirmative expert was harmless or justified.

"In determining whether the failure to comply with Rule 26(a) is justified or harmless, courts weigh four factors: (1) the prejudice or surprise to the party against whom the testimony is

---

[94] *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 759 (8th Cir. 2006) (quoting *United States v. Lamoreaux*, 422 F.3d 750, 755 (8th Cir. 2005)) (also citing *Cates v. Sears, Roebuck & Co.*, 928 F.2d 679, 685 (5th Cir. 1991)) (internal citations omitted).
[95] *Spring Creek Expl. & Prod. Co., LLC v. Hess Bakken Inv. II, LLC*, No. 14-CV-00134-PAB-KMT, 2016 WL 1597529, at *3 (D. Colo. 2016) (citing *1–800 Contacts, Inc. v. Lens. com, Inc.*, 755 F.Supp.2d 1151, 1167 (D. Utah 2010) (*rev. in part on other grounds*, 722 F.3d 1229 (10th Cir. 2013)).
[96] Pl. Exp. Mot. 9.
[97] Defendants' Opposition to Plaintiff's Motion to Exclude Krista Holt's Expert Report ("Def. Exp. Opp.") 14, ECF No. 139, filed Oct. 25, 2024.

offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness."[98]

Alfwear argues that it will be prejudiced if Ibkul is permitted to rely on the Fame Survey because it was not on notice that it would need to refute this kind of testimony.[99] Ibkul did not disclose that it planned to offer the Fame Survey or similar testimony, so Alfwear did not retain its own expert to conduct an updated Fame Study or refute Ms. Holt's findings. By the same token, Alfwear's ability to cure this prejudice is low. The deadline for expert discovery has passed, and extending these deadlines to allow for further expert discovery would likely delay any potential trial.

Alfwear has not argued that the Fame Study was included in the Holt Report in bad faith or that its inclusion will disrupt any possible trial. However, the balance of these factors weighs in favor of excluding the study. The Fame Study is not responsive to the Harper Report and Alfwear does not have the ability to find another expert to conduct a responsive study at this stage in the litigation. Accordingly, the Fame Survey and Ms. Harper's testimony about it are excluded.

Alfwear next argues that Ms. Holt's opinion on damages should be excluded because it is untimely.[100] It argues that Ibkul needed to disclose Ms. Holt as a damages expert by the affirmative expert disclosure deadline as the party bearing the burden of proof on damages.[101] Ibkul responds that the damages opinion is not untimely because Ms. Harper was designated as

---

[98] *Id.* (citing *Jacobsen,* 287 F.3d at 953).
[99] Pl. Exp Mot. 9.
[100] *Id.* at 10.
[101] *Id.* at 10–11.

18

an expert on "damages issues in the case," so Ms. Holt's opinion is responsive rebuttal opinion.[102]

"Rebuttal expert reports cannot present new arguments and rebuttal experts 'must restrict their testimony to attacking the theories offered by the adversary's experts.'"[103] "[T]he fact that the Defendants' experts. . . offered expert opinions about Plaintiffs' damages does not unequivocally mean that the opinions are necessarily in rebuttal. Instead, the relevant inquiry is whether a responding expert witness limits himself to 'poking holes' in the Plaintiffs' expert report, or whether the Defendants' experts are, perhaps in addition to 'poking holes," offering new theories or addressing topics not directly presented in Plaintiffs' original experts' opinions."[104]

Ibkul argues that Ms. Holt's report is responsive because Ms. Harper was designated as an expert on damages issues in the case.[105] But Ms. Harper was not designated as a damages expert—she was designated to serve as an expert regarding research surveys and consumer confusion.[106] Alfwear's disclosure states that Ms. Harper's opinions "may also be offered in support of damages issues in the case" but does not inform Ibkul that Ms. Harper will offer an expert opinion on damages or give a calculation of damages.[107] Moreover, the Harper Report does not mention damages or offer a calculation of damages. Therefore, any opinion offered by

---

[102] Def. Exp. Opp. 15.
[103] *Mountain Food, LLC v. Sentry Ins.*, No. 120CV03083CNSSTV, 2023 WL 2352822, at *3 (D. Colo. 2023) (quoting *Spring Creek Expl. & Prod. Co.*, 2016 WL 1597529, at *3).
[104] *Spring Creek Expl. & Prod. Co.*, 2016 WL 1597529, at *6 (citing *Van Maanen v. Youth With a Mission-Bishop*, No. 1:10-CV-00493 AWI, 2011 WL 5838185, at *3 (E.D. Cal. 2011)).
[105] Def. Exp. Opp. 15.
[106] Plaintiff's Expert Disclosures 2, ECF No. 145-1, filed Nov. 8, 2024.
[107] *Id.*

Ms. Holt about damages is not responsive to the Harper Report and is not proper rebuttal testimony.

Ibkul argues that Ms. Holt's damages opinion is timely because it responds to Alfwear's Second Supplemental Disclosures, which offered a computation of damages.[108] But Ms. Holt's damages opinion does not refer to the Supplemental Disclosures. Ibkul does not explain why Alfwear's Supplemental Disclosures should excuse its responsibility to disclose an expert who would offer testimony that goes beyond the Harper Report.

Finally, Ibkul asserts that its failure to disclose Ms. Holt's designation as a damages expert was substantially justified or harmless.[109] However, like with the Fame Survey, Ibkul's failure to disclose Ms. Holt is prejudicial to Alfwear. The deadline for expert discovery has passed and Alfwear does not have the opportunity to retain a responsive damages expert. It would be highly prejudicial to allow this damages testimony into trial without giving Alfwear an opportunity to respond with its own expert. Accordingly, Ms. Holt's report on damages and any related testimony is excluded.

### B. Qualifications

Alfwear next argues that Ms. Holt is not qualified to offer an opinion on whether the parties sell in different product categories.[110] It argues that Ms. Holt has no experience in the apparel market and is not designated as an expert in marketing or apparel.[111] Ibkul does not address this argument in its briefing.

---

[108] Def. Exp. Opp. 15.
[109] Def. Exp. Opp. 16.
[110] Pl. Exp. Mot. 8.
[111] *Id.*

An expert witness is qualified when they have sufficient training or background in a particular field "as to make it appear that [their] opinion would rest on substantial foundation and would tend to aid the trier of fact in his search for the truth."[112] "Rule 702 allows expert testimony only where the 'witness [is] qualified as an expert by knowledge, skill, experience, training, or education' to offer such opinions."[113] The proponent of expert testimony bears the burden of demonstrating the expert's qualification."[114]

Ms. Holt's report states that she is the managing director of a research and consulting firm with experience in antitrust, damages, employment, energy, health care, intellectual property, international arbitration, surveys, statistical analysis, and valuation.[115] Ibkul does not argue that this list of qualifications includes a qualification to opine on whether the parties sell similar products or offer any reason why Ms. Holt should be allowed to offer her opinion on product categories. Accordingly, Ibkul has failed to meet its burden to show that Ms. Holt is qualified to offer expert testimony on this issue, and Section VII C of Ms. Holt's report is excluded.

Alfwear does not challenge Ms. Holt's qualifications to offer the other rebuttal opinions presented in her report. Ms. Holt's experience and education qualify her to offer a rebuttal opinion on Ms. Harper's Confusion Survey. Ms. Holt has a master's in business administration and has over ten years of experience in accounting and marketing.[116] Ms. Holt has provided

---

[112] *Graham by Graham v. Wyeth Lab'ys, Div. of Am. Home Prods. Corp.*, 906 F.2d 1399, 1408 (10th Cir. 1990) (quoting *Bridger v. Union Railway Co.*, 355 F.2d 382, 387 (6th Cir. 1966)).
[113] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 928 (10th Cir. 2004) (quoting Fed. R. Evid. 702).
[114] *Taber v. Allied Waste Sys., Inc.*, 642 F. App'x 801, 807 (10th Cir. 2016) (citing *Ralston.*, 275 F.3d at 970 n.4).
[115] Holt Report 1.
[116] Holt Report Appendix A 1.

survey services in trademark disputes for over fifteen years, including designing and rebutting trademark surveys.[117] She also has also presented on survey design and brand valuation.[118] Accordingly, the court evaluates Ms. Holt's rebuttal testimony to determine whether it is reliable.

### C.  Critique of Confusion Survey

Alfwear argues that Ms. Holt's critique of the Confusion Survey should be excluded because Ms. Holt uses an incorrect standard to evaluate the data.[119] Ibkul argues that Ms. Holt used the correct industry standard to rebut the survey, so her opinion should not be excluded.[120] To support its argument, Ibkul submitted and relies on a supplemental declaration by Ms. Holt (the "Holt Declaration").[121] Alfwear objects to the Holt Declaration, arguing that it is an improper attempt to change and deepen Ms. Holt's opinions in response to Alfwear's Motion to Exclude.[122]

Federal Rule of Civil Procedure 26 states that an expert must "supplement or correct its disclosure or response. . . if the party learns that in some material respect the disclosure is incomplete and incorrect, and if the additional corrective information has not otherwise been made known to the other parties during the discovery process or in writing."[123] "Highlighting previous testimony is not proper supplementation under Rule 26(e)."[124] "A supplemental expert

---

[117] *Id.*
[118] *Id.* at 2.
[119] Alfwear also argues that Ms. Holt improperly relies on declarations that were not disclosed in accordance with the Rules of Civil Procedure. *See* Pl. Exp. Mot. 7. This argument only addresses Section VII C of the Holt Report, which contains opinions that Ms. Holt is not qualified to give. Accordingly, the court does not further address Alfwear's arguments about the declarations.
[120] Def. Exp. Opp. 7–8.
[121] Declaration of Krista Holt in Opposition to Plaintiff's Motion to Exclude Krista Holt's Expert Report ("Holt Decl."), ECF No. 139-6, filed Oct. 25, 2024.
[122] Pl. Exp. Reply 2.
[123] Fed. R. Civ. P. 26 (2)(e), (4)(e)(1).
[124] *Rodgers v. Beechcraft Corp.*, 759 F. App'x 646, 663 (10th Cir. 2018).

report that states additional opinions or seeks to 'strengthen' or 'deepen' opinions expressed in the original expert report exceeds the bounds of permissible supplementation and is subject to exclusion under Rule 37(c)."[125]

The Holt Declaration states that it is offered in response to Alfwear's motion to exclude.[126] It does not reference any new information that was unavailable when the Holt Report was prepared or offer any corrections, but seeks to "clarify and supplement" the Report "[i]n light of plaintiff's challenges."[127] But responding to a motion is not a basis to supplement or correct an expert report.[128] The Declaration was prepared simply to strengthen and deepen Ms. Holt's opinions, which the Rules do not allow. Accordingly, the court does not consider the Holt Declaration or Ibkul's arguments based on it.

Ibkul next argues that Ms. Holt's critique of the standard used to evaluate the survey in the Harper Report is valid.[129] Alfwear disagrees, arguing that the standard Ms. Holt evaluates the survey under is outdated.[130] "However, '[t]echnical and methodological deficiencies in [a] survey. . . bear on the weight of the evidence, not the survey's admissibility.'"[131] The experts' competing opinions about which standard should be used "present the classic battle of the experts and it is up to a jury to evaluate what weight and credibility each expert opinion

---

[125] *Midrash v. Philadelphia Indem. Ins. Co.*, No. 1:23-CV-00594-SKC-TPO, 2025 WL 661998, at *3 (D. Colo. 2025) (quoting *Cook v. Rockwell Int'l Corp.*, 580 F. Supp. 2d 1071, 1169 (D. Colo. 2006)).
[126] Holt Decl. ¶ 3.
[127] *Id.* at ¶ 27.
[128] *Mickelsen v. Aramark Sports & Ent. Servs.*, No. 2:18-CV-00158-DN, 2021 WL 1740556, at *4 (D. Utah 2021) (striking supplemental report because "the Federal Rules of Civil Procedure do not permit an expert to add new material in a supplemental report that could have been included in the initial affirmative or rebuttal report).
[129] Def. Exp. Opp. 7.
[130] Pl. Exp. Mot. 2.
[131] *ClearPlay, Inc. v. Dish Network, LLC*, No. 2:14-CV-00191-DN-CMR, 2023 WL 185434, at *5 (D. Utah 2023) (quoting *Harolds Stores, Inc. v. Dillard Dep't Stores, Inc.*, 82 F.3d 1533, 1544 (10th Cir. 1996)).

deserves."[132] If Ms. Holt's rebuttal opinion uses an outdated standard, Alfwear may seek to present that information to the jury at trial. However, it is not a sufficient basis to exclude Ms. Holt's opinions at this stage.

In sum, Alfwear has demonstrated that the Fame Survey and damages calculations should be excluded. It has also established that Ms. Holt cannot offer testimony about whether the parties sell in different product categories. Accordingly, Sections IV, V, VIII, and IX and any related testimony at trial are excluded. The court does not consider any of Ms. Holt's inadmissible expert testimony in ruling on either party's summary judgment motion.[133]

## II.    Alfwear Expert Ms. Harper

Ibkul argues that the Confusion Survey in Ms. Harper's report should be excluded due to methodological errors, including failing to replicate real world conditions, using the wrong universe for respondents, and asking leading questions.[134] Alfwear responds that the Confusion Survey was conducted according to accepted principles and should be admitted.[135]

Ms. Harper has a master's degree in business administration and has worked in a variety of marketing and communications roles.[136] She has over ten years' experience as a litigation consultant, during which time she has designed and performed research studies into consumer beliefs.[137] Ms. Harper has also been an adjunct professor in marketing and has guest-lectured at

---

[132] *Thompson v. State Farm Mut. Auto. Ins. Co.*, 457 F. Supp. 3d 998, 1005 (D. Colo. 2020) (quoting *OraLabs, Inc. v. Kind Grp. LLC*, No. 13-cv-00170-PAB-KLM, 2015 WL 4538444, at *5 (D. Colo. 2015)) (also quoting *Phillips v. Cohen*, 400 F.3d 388, 399 (6th Cir. 2005)).
[133] *See Rodgers v. Beechcraft Corp.*, 248 F. Supp. 3d 1158, 1171 (N.D. Okla. 2017), *aff'd*, 759 F. App'x 646 (10th Cir. 2018) (citing *Milne v. USA Cycling Inc.*, 575 F.3d 1120, 1134 (10th Cir. 2009)) ("inadmissible expert testimony may not be considered in ruling on a motion for summary judgment.")
[134] Def. Exp. Mot. 3.
[135] Pl. Exp. Opp. 3.
[136] Harper Report 32.
[137] *Id.* at 7.

several universities.[138] Taken together, Ms. Harper's education and background qualify her to testify as an expert in this case.[139] Therefore, the court evaluates her report to determine if it is reliable.

The court first addresses whether the Confusion Survey uses reliable methodology. Then, it turns to whether Ms. Harper reliably applied this methodology and addresses Ibkul's arguments against the Report's admission.

### A. Methodology

"To determine whether expert testimony is admissible requires a trial court to examine 'whether the reasoning or methodology underlying the testimony is scientifically valid.'"[140] "Although many factors may bear on whether expert testimony is based on sound methods and principles, the *Daubert* Court offered five non-exclusive considerations: whether the theory or technique has (1) been or can be tested, (2) been peer-reviewed, (3) a known or potential error rate, (4) standards controlling the technique's operation, and (5) been generally accepted by the scientific community."[141] However, this list is not exhaustive, and a trial judge has "wide discretion both in deciding how to assess an expert's reliability and in making a determination of that reliability."[142]

"The first *Daubert* question is whether the technique can be and has been tested."[143] Squirt-style consumer confusion surveys, like the Confusion Survey, have been used in

---

[138] *Id.*
[139] Ibkul has not challenged Ms. Harper's qualifications to serve as an expert witness in this case.
[140] *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1233 (10th Cir. 2005).
[141] *Etherton v. Owners Ins. Co.*, 829 F.3d 1209, 1217 (10th Cir. 2016) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593–94 (1993)).
[142] *Id.* (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 152–53 (1999)).
[143] *United States v. Baines*, 573 F.3d 979, 990 (10th Cir. 2009).

trademark disputes since at least the 1980s.[144] They have been tested through court proceedings,[145] and may be relied upon to show actual confusion.[146] Therefore, this factor weighs in favor of the admissibility of the Confusion Survey.

"The second *Daubert* factor is whether the theory or process has been subject to peer review and publication."[147] Ms. Harper relied on testing principles from the Federal Judicial Center Manual for Complex Litigation.[148] However, the Report does not mention, and Alfwear does not provide, any evidence that the methodology Ms. Harper used has been subject to peer review. Accordingly, this factor is neutral.

"The third *Daubert* factor is the known or potential error rate of the procedure."[149] Probability sampling is "generally speaking, an unrealizable ideal" for trademark surveys.[150] Although consumer confusion surveys do not permit the computation of an error rate, courts still regularly admit these surveys in trademark disputes.[151] Therefore, this factor weighs in favor of admissibility.

"The fourth *Daubert* factor is the existence and maintenance of standards controlling the technique's operation."[152] Ms. Harper relied on the Federal Judicial Center's seven-factor framework for studies used in complex litigation to carry out the survey.[153] These criteria have

---

[144] *See SquirtCo. v. Seven-Up Co.*, 628 F.2d 1086 (8th Cir. 1980); *see also* 5 McCarthy on Trademarks and Unfair Competition § 32:174.50 (5th ed.).
[145] *Baines*, 573 F.3d at  990 (allowing technique that has been tested through "court proceedings").
[146] *Jordache Enterprises, Inc. v. Hogg Wyld, Ltd.*, 828 F.2d 1482, 1487 (10th Cir. 1987) (quoting *Standard Oil Co. v. Standard Oil Co.*, 252 F.2d 65, 75 (10th Cir. 1958)).
[147] *Baines*, 573 F.3d at990.
[148] Harper Report 11.
[149] *Baines*, 573 F.3d at 990.
[150] 5 McCarthy on Trademarks and Unfair Competition § 32:165 (5th ed.).
[151] *OraLabs, Inc. v. Kind Grp. LLC*, No. 13-CV-00170-PAB-KLM, 2015 WL 4538444, at *4 (D. Colo. 2015) ("the Tenth Circuit recognizes survey results as evidence of actual confusion.") (collecting cases).
[152] *Baines*, 573 F.3d at 991.
[153] Harper Report 11.

been "widely adopted by the courts in trademark cases."[154] These standards weigh in favor of admissibility.

"The fifth *Daubert* factor is whether the technique has attained general acceptance in the relevant scientific or expert community."[155] Squirt surveys are "an accepted methodology" in trademark disputes.[156] Accordingly, this factor weighs in favor of admissibility.

Taken together, the *Daubert* factors weigh in favor of admissibility. Ms. Harper used an accepted method for measuring consumer confusion in trademark disputes and applied recognized standards. Therefore, the court next addresses whether Ms. Harper reliably applied this methodology to produce her expert report.

## B. Application

A survey is admissible if it is "material, more probative on the issue than other evidence and if it has guarantees of trustworthiness."[157] "To assess the validity and reliability of a survey, a court should consider a number of criteria, including whether: (1) the universe was properly chosen and defined; (2) the sample was representative of that universe; (3) the survey's methodology and execution were in accordance with generally accepted principles; (4) the questions were leading or suggestive; and (5) the data was accurately gathered and reported."[158] "Although methodological flaws in a confusion survey will typically affect only the survey's

---

[154] *Admissibility and weight of consumer survey in litigation under trademark opposition, trademark infringement, and false designation of origin provisions of Lanham Act*, 98 A.L.R. Fed. 20 (Originally published in 1990).
[155] *United States v. Baines*, 573 F.3d 979, 991 (10th Cir. 2009).
[156] *BillFloat Inc. v. Collins Cash Inc.*, 105 F.4th 1269, 1275 (9th Cir. 2024); *see also Elevate Fed. Credit Union v. Elevations Credit Union*, No. 120CV00028DAKJCB, 2022 WL 798901, at *12 (D. Utah 2022), *aff'd*, 67 F.4th 1058 (10th Cir. 2023) ("the Tenth Circuit does not prohibit *Squirt* surveys") (citations omitted).
[157] *Harolds Stores, Inc. v. Dillard Dep't Stores, Inc.*, 82 F.3d 1533, 1544 (10th Cir. 1996) (quoting *Brunswick Corp. v. Spinit Reel Co.*, 832 F.2d 513, 522 (10th Cir. 1987)).
[158] *Water Pik, Inc. v. Med-Sys., Inc.*, No. 10-CV-01221-PAB-CBS, 2012 WL 202782, at *4 (D. Colo. 2012) (citing 5 McCarthy on Trademarks and Unfair Competition § 32:159 (5th ed.)).

weight and not its admissibility, these flaws may justify exclusion under Rule 702 if they are serious and pervasive enough."[159]

The court first considers the Confusion Survey's universe and whether the sample it considered was representative. Then, Ibkul's arguments about the survey conditions are evaluated. Finally, the court analyzes the survey's methodology, questions, and data.

### i.    Confusion Survey Universe

Ibkul first argues that the Harper Report should be excluded because the relevant universe it surveyed is not accurate.[160] It argues that its customer base is primarily women who purchase their products at country clubs and other "green grass" retailers.[161] Ibkul next contends that the Confusion Survey should have screened for respondents who have the income of an average country club member and are willing to pay the $100.90 average retail price for its products.[162] Ibkul also argues that the Confusion Survey used the wrong geographic area, as 43% of its revenues come from Florida and the survey is geographically split across the country.[163]

Alfwear responds that the Confusion Survey used an appropriate universe because it included respondents who have purchased performance wear or athleisure clothing.[164] It contends that the survey universe is not overinclusive because it includes both past and potential Ibkul customers.[165] Alfwear also argues that by screening for participants that indicated they

---

[159] *1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1246 (10th Cir. 2013) (citing *Brunswick Corp*, 832 F.2d at 523) (also citing *Vail Assocs., Inc. v. Vend-Tel-Co.*, 516 F.3d 853, 864 n.8 (10th Cir. 2008)).
[160] Def. Exp. Mot. 10.
[161] *Id.* at 11.
[162] *Id.*
[163] *Id.*
[164] Pl. Opp. 7.
[165] *Id.*

would purchase "performance wear" or "athleisure" within the next year, the survey is properly limited.[166]

"A survey universe is an important factor in assessing the validity of a survey because survey respondents must 'adequately represent the opinions which are relevant to the litigation.'"[167] "Consequently, a survey's 'appropriate universe should include a fair sampling of those purchasers most likely to partake of the alleged infringer[']s goods or services.'"[168] "The appropriate universe for a customer survey is the universe of potential customers, not just those consumers who are specifically interested in the precise product offered by plaintiff."[169] "Generally, technical and methodological deficiencies in [a] survey, including the sufficiency of the universe sampled, bear on the weight of the evidence, not the survey's admissibility."[170] Courts "should exclude [a] survey 'when the sample is clearly not representative of the universe it is intended to reflect.'"[171]

The Harper Report states that "the relevant universe was defined as past and potential purchasers of Defendants' products."[172] Ms. Harper states that she selected participants who fit into this universe by screening for individuals who "had purchased or would consider purchasing the type of products Defendants sell, shop at a retailer that sells Defendants' products, and would pay the price of Defendants' products."[173] Ibkul argues there should be a far more limited

---

[166] Id.
[167] OraLabs, 2015 WL 4538442, at *5  (quoting Harolds Stores, 82 F.3d at 1544).
[168] Id. (quoting Exxon Corp. v. Texas Motor Exch. of Houston, Inc., 628 F.2d 500, 507 (5th Cir. 1980)).
[169] GeigTech E. Bay LLC v. Lutron Elecs. Co., No. 18 CIV. 05290 (CM), 2023 WL 6614486, at *14 (S.D.N.Y. 2023); see also 3 McCarthy on Trademarks and Unfair Competition § 23:5 (5th ed.) ("A potential customer is one who might some day purchase this kind of product or service and pays attention to brands in that market.").
[170] Water Pik, 2012 WL 2153162, at *2  (citing Brunswick Corp. 832 F.2d at 523).
[171] Harolds Stores, 82 F.3d at 1544 (quoting Bank of Utah v. Commercial Sec. Bank, 369 F.2d 19, 27 (10th Cir. 1966), cert. denied, 386 U.S. 1018 (1967)).
[172] Harper Report 13.
[173] Id.

29

universe, arguing that the survey should be excluded because its respondents are outside Ibkul's

typical shopper, a woman in Florida with an income around $150,000 who is willing to pay

around $100 for apparel and shops at golf, tennis, and country clubs.[174]

Although the Confusion Survey's universe may include respondents that do not fit the

mold for a typical Ibkul customer, it does include customers that are relevant to the litigation. It

only includes respondents who will purchase athleisure or performance wear, and Ibkul sells

athleisure and performance wear.[175] The opinions of these customers are relevant to whether

there is confusion in the marketplace. Ibkul has not shown that the survey universe was so

overinclusive that the survey as a whole has no probative value and clearly does not represent

their potential customers.

Moreover, Ibkul has not argued that the survey is overinclusive because its only

customers are wealthy women in Florida. Ibkul never states that it would not like to sell its

products to the other groups reflected in the survey or that its products are not available to these

groups.[176] It does not claim that the other groups are not potential customers or that individuals

outside their typical customer are irrelevant. It only summarizes portions of its expert's rebuttal

that address the survey universe.[177] Based on this argument, the court cannot conclude that the

survey universe is so unrepresentative of Ibkul's customers that the data is irrelevant.

Ibkul references the Tenth Circuit's decision in *Water Pik, Inc. v. Med-Systems, Inc.* to

support the proposition that the court should be concerned about a survey's methodology if there

---

[174] Def. Exp. Mot. 11.
[175] Gauba Dep. 85:3–10 (stating that Ibkul sells athleisure); 107:1–9 (stating that sales come from Florida, California, Texas, North Carolina, and South Carolina).
[176] *Id.* at 22:2–5 (Ibkul employes sales contractors throughout the United States); 81:13–14 (Ibkul sells men's, women's, and kids' apparel); 192:21–25 (Ibkul advertises across the United States).
[177] Def. Exp. Mot. at 10–11.

is an overinclusive survey universe.[178] In that case, the district court found a confusion survey's
results lacked any probative value for several reasons, including an overinclusive survey
universe.[179] However, the survey universe in *Water Pik* was far broader than the universe used in
Ms. Harper's survey. There, the survey universe included respondents who were "potential
purchasers of sinus remedies in general, not potential purchasers of sinus-irrigation products in
particular (which account for only 1% of sinus-remedy sales)."[180] A similarly overinclusive
survey universe in this case might include purchasers of all clothes, instead of the actual universe
which included only potential purchasers of athleisure or performance wear.[181] The consumers
represented in the Confusion Survey reasonably approximate Ibkul's potential customers;
therefore, the survey universe is not so broad that the Survey should be excluded.

Finally, Ibkul contends that the survey universe is too broad because it contains
individuals interested in athleisure wear, which it argues is a "very general class of products."[182]
However, Ibkul sells athleisure wear.[183] It does not explain why the survey universe should not
consider individuals interested in athleisure wear, which includes its product line. Therefore, it
has not shown that the survey is so broad that it does not represent potential Ibkul customers, and
the Confusion Survey should not be excluded on this basis.

---

[178] 726 F.3d 1136, 1145 (10th Cir. 2013); Def. Exp. Mot. 10–11.
[179] *Id.* at 1145.
[180] *Id.*
[181] Harper Report 20.
[182] Reply Brief in Support of Motion to Exclude Testimony and Opinions of Plaintiff's Survey Expert Rhonda
Harper 8, ECF 151, filed Nov. 8, 2024.
[183] Jamie Handler Deposition Transcript 94:15–17, ECF No. 138-3, filed Oct. 25, 2024 (stating that Ibkul products
fit in an athleisure category "without a doubt.").

### ii.    Confusion Survey Conditions

Ibkul next argues that the Confusion Survey's use of hang tags does not replicate real
world conditions, so it should be excluded.[184] It challenges the Survey's use of hang tags without
showing the parties' clothing, arguing that showing only the hang tags fails to recreate
marketplace conditions.[185] Next, it argues that IBKÜL and KÜHL products are not sold at the
same retailers at the same time, so consumers would never actually compare the parties' hang
tags.[186] Ibkul also argues that survey conditions do not match real world condition because
IBKÜL is in a different product category than KÜHL.[187] KÜHL responds that the Confusion
Survey approximated market conditions and should not be excluded.[188]

Ibkul emphasizes the differences between the parties' products, including their distinct
appearances and differences in when and where they are sold.[189] Although it is true that the
likelihood of confusion is greater when products are more similar, the similarity of products is an
issue for the jury to decide.[190] It is not a reason to exclude the Confusion Study. Ibkul attempts to
shed doubt on the study's conclusions by arguing that it did not show qualified participants the
parties' products, which it seems to contend are different enough that consumers would not think

---

[184] Def. Exp. Mot. 9.
[185] *Id.*
[186] *Id.* at 8–9.
[187] *Id.*
[188] Plaintiff's Opposition to Motion to Exclude Testimony and Opinions of Plaintiff's Survey Expert Rhonda Harper
("Pl. Exp. Opp.") 3, ECF No. 136, filed Oct. 25, 2024.
[189] Def. Exp. Mot. 10.
[190] *See Universal Money Centers, Inc.*, 22 F.3d at 1532 (quoting *Exxon Corp. v. Texas Motor Exch.*, 628 F.2d 500,
505 (5th Cir. 1980)) (stating that "[t]he greater the similarity between the products and services, the greater the
likelihood of confusion."); *John Allan Co. v. Craig Allen Co. L.L.C.*, 540 F.3d 1133, 1138 (10th Cir. 2008)
("Whether the use of a mark will result in a likelihood of confusion, and thus violate the Lanham Act, is a question
of fact"); *Heartland Animal Clinic, P.A. v. Heartland SPCA Animal Med. Ctr., LLC*, 503 F. App'x 616, 618 n.1 (10th
Cir. 2012) (the issue of whether a mark presents a likelihood of confusions is a factual question) (citations omitted).

that they come from the same brand.[191] This is an argument about possible deficiencies in the survey, not its admissibility. The survey may have less evidentiary value due to its failure to show the products themselves, but Ibkul has not shown that this is a sufficient basis to exclude the Harper Report.

Next, Ibkul argues that the Confusion Survey should be excluded because it does not accurately reflect market conditions.[192] "[I]n order to test for actual confusion, '[m]arks should be compared as a whole as they are encountered by consumers in the marketplace.'"[193] "[T]he closer the survey methods mirror the situation in which the ordinary person would encounter the trademark, the greater the evidentiary weight of the survey result."[194]

Ibkul argues that the Confusion Survey was flawed because it used an inappropriate side-by-side comparison for the hang tags.[195] It argues that the survey did not recreate real world conditions, as the parties' products are different and are not sold in the same stores.[196] Alfwear responds that the Confusion Survey appropriately approximates marketplace conditions because both parties use hang tags in the marketplace, which consumers would see when purchasing their products.[197]

Ibkul relies on the Tenth Circuit decision in *Alfwear, Inc. v. Mast-Jaegermeister US, Inc.* for the proposition that a side-by-side comparison is only appropriate if consumers would

---

[191] Def. Exp. Mot. 10.
[192] *Id.* at 9.
[193] *Alfwear, Inc. v. Mast-Jaegermeister US, Inc.*, 2023 WL 5765891, at *11 (10th Cir. 2023) (quoting *Water Pik, Inc. v. Med-Sys., Inc.*, 726 F.3d 1136, 1146 (10th Cir. 2013)).
[194] *Water Pik,* 726 F.3d at 1146 (quoting 6 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 32:163, at 32–357).
[195] Def. Exp. Mot. 7.
[196] *Id.* at 8.
[197] Pl. Exp. Opp. 5.

encounter the marks side by side in the marketplace.[198] There, the court upheld the district court's decision to give little evidentiary weight to a confusion survey where participants could view the plaintiff's and defendant's marks on their screens simultaneously.[199] The court reasoned that because the marks "ordinarily would be encountered in separate contexts, a side-by-side comparison format was methodologically flawed and of limited probative value."[200]

This case is distinguishable for at least two reasons. First, the Harper Report did not use a similar side-by-side format. Survey participants were shown Hang Tag A, the KÜHL tag, once at the beginning of the survey.[201] They could not view the KÜHL tag along with the IBKÜL tag or any of the control tags at the same time. Second, neither the district court nor the Tenth Circuit held that the side-by-side confusion survey was so flawed that it should be excluded. The Tenth Circuit only upheld the district court's decision to give the survey little evidentiary weight.[202]

The same conclusion is warranted here. Although Ibkul has pointed out issues with the survey that may diminish its evidentiary value, none of these flaws are so serious and pervasive that the entirety of the Confusion Survey should be excluded. The differences Ibkul highlights between IBKÜL and KÜHL products and where these products are sold goes to the weight, not the admissibility, of the Confusion Survey. Accordingly, the Harper Report should not be excluded due to survey conditions.

---

[198] No. 21-4029, 2023 WL 5765891, at *11 (10th Cir. 2023).
[199] *Id.* at 10.
[200] *Id.* (citing *Water Pik*, 726 F.3d at 1147) (also citing *Jordache Enterprises, Inc. v. Hogg Wyld, Ltd.*, 828 F.2d 1482, 1488 (10th Cir. 1987)).
[201] Harper Report 21.
[202] No. 21-4029, 2023 WL 5765891, at *11 (10th Cir. 2023).

### iii.    Confusion Survey Methodological Errors

Finally, Ibkul argues that the Confusion Survey's methodology was unreliable. It argues that the questions included were leading and suggestive, that different control hang tags should have been used, and that there were errors in the report's calculations.[203] Alfwear disagrees, arguing that the Confusion Survey used proper and reliable methodology. As with the rest of Ibkul's challenges to the Harper Report, any technical or methodological flaws in the confusion survey only affect the survey's weight, and not its admissibility, unless they are "serious and pervasive."[204]

Ibkul relies on its expert report to argue that the Confusion Survey's questions on whether hang tags came from the same brand as Hang Tag A (the KÜHL tag) were leading.[205] It states that the questions would unfairly lead a survey respondent to connect the test or control tag with the KÜHL tag.[206] Alfwear responds that Ibkul ignores the impact of the Survey's control group, which accounts for any errors that the questions may have presented.[207]

"A survey question that begs its answer by suggesting a link between plaintiff and defendant cannot be a true indicator of the likelihood of consumer confusion."[208] Survey questions risk "sowing confusion" between different marks when they "suggest the possibility" that the marks are connected and limit the number of marks a respondent is shown.[209] Even so,

---

[203] Def. Exp. Mot. 12–15.
[204] *1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1246 (10th Cir. 2013) (citations omitted).
[205] Holt Report 40.
[206] Def. Exp. Mot. 12.
[207] Pl. Exp. Opp. 7–8.
[208] *Water Pik*, 726 F.3d at 1147 (quoting *Scott Fetzer Co. v. House of Vacuums, Inc.*, 381 F.3d 477, 488 (5th Cir. 2004)).
[209] *Hornady Mfg. Co. v. Doubletap, Inc.*, 746 F.3d 995, 1006 (10th Cir. 2014) (citing *Water Pik*, 726 F.3d at 1148).

leading questions that "prevent the survey from eliciting responses as they might occur spontaneously in the marketplace" go to the weight of the evidence, not its admissibility.[210]

Ibkul has not shown that any survey questions were so leading that the Confusion Survey should be excluded. It does not explain why any questions used in the survey were so leading that they cause serious and pervasive flaws in the Harper Report. Moreover, the survey's use of a control group provides assurances of its reliability. Accordingly, the Confusion Survey should not be excluded due to potentially leading questions.

Ibkul also argues that the Confusion Survey was flawed because the control hang tag with the fictitious Ibset mark was inappropriate.[211] It does not argue that Ms. Harper violated any survey design principles by using the Ibset mark, but seems to contend that another fictitious hang tag, such as "IBCÖOL" should have been used.[212] Ibkul advances this argument based on testimony from Kevin Boyle, Alfwear's CEO, and not any criticisms of the survey itself.[213]

Like with its other arguments about the survey's alleged methodological errors, Ibkul has not persuasively explained why this supposed error is so severe that the Confusion Survey should be excluded. Ibkul has not argued that the use of the fictitious Ibset tag violated any standards for survey design or was erroneous beyond quoting their expert report that says other control tags would have been "more appropriate."[214] This falls short of the serious and pervasive errors that must be present for the court to exclude Ms. Harper's survey.

---

[210] *Id.*
[211] Def. Exp. Mot. 14.
[212] *Id.*
[213] *Id.* at 14.
[214] *Id.*

In total, Ibkul has introduced criticisms of the Confusion Survey that may ultimately show that the Survey, and Ms. Harper's opinions based on it, have little evidentiary value. But that is a decision for the jury. Ibkul has not established that the Survey has such serious and pervasive flaws that the court should exclude it altogether. Accordingly, Ibkul's motion to exclude Ms. Harper is denied.

Next, the court addresses the parties' motions for summary judgment.

## SUMMARY JUDGMENT STANDARD

"A party is entitled to summary judgment if, viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."[215] "A factual issue is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[216] "The nonmoving party is entitled to all reasonable inferences from the record; but if the nonmovant bears the burden of persuasion on a claim at trial, summary judgment may be warranted if the movant points out a lack of evidence to support an essential element of that claim and the nonmovant cannot identify specific facts that would create a genuine issue."[217]

## DISCUSSION

A trademark is "any word, name, symbol, or device, or any combination thereof ... [used] to identify and distinguish [the owner's] goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is

---

[215] *Affliction Holdings, LLC v. Utah Vap or Smoke, LLC*, 935 F.3d 1112, 1114 (10th Cir. 2019) (citing *Hobbs ex rel. Hobbs v. Zenderman*, 579 F.3d 1171, 1179 (10th Cir. 2009)).
[216] *Water Pik*, 726 F.3d at 1143 (quoting *Sally Beauty Co.*, 304 F.3d at 972).
[217] *Id.* at 1143–44.

unknown."[218] "Claims of trademark infringement require a party to establish that it has a legal right to a mark and that the defendant's use of a similar mark is likely to generate consumer confusion in the marketplace."[219] In the Tenth Circuit, "likelihood of confusion is a question of fact amenable to summary judgment, only if no reasonable juror could find likelihood of confusion between plaintiff's and defendant's marks."[220]

Alfwear moves for partial summary judgment on the first element of a trademark claim, arguing that it has a protectable interest in the KÜHL mark. It also moves for summary judgment on three of Ibkul's affirmative defenses. Ibkul moves for summary judgment on all five of Alfwear's claims.

Before turning to the parties' arguments on the trademark claims, the court addresses two evidentiary issues. In its Reply in Support of its Motion for Summary Judgment, Ibkul lists several objections to Alfwear's evidence.[221] It states that several exhibits are irrelevant or are hearsay, which Alfwear disputes.[222] Alfwear has also raised evidentiary objections to two affidavits attached to Ibkul's Reply in Support.[223]

Under Federal Rule of Civil Procedure 56, a "party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."[224]

---

[218] 15 U.S.C. § 1127.
[219] *Affliction Holdings,* 935 F.3d at 1114 (citing *1-800 Contacts,* 722 F.3d at 1238).
[220] *Id.* (quoting *Sally Beauty Co.,* 304 F.3d at 972) (also quoting *King of the Mountain Sports, Inc.*, 185 F.3d at 1093).
[221] Reply in Support of Defendants' Motion for Summary Judgment ("Def. MSJ Reply") 11–13, ECF No. 161, filed Nov. 22, 2024.
[222] Plaintiff's Responses to Defendants' Evidentiary Objections in Defendants' Reply in Support of Motion for Summary Judgment, ECF. 170, filed Dec. 4, 2024.
[223] Plaintiff's Objections to Evidence Submitted with Defendants' Reply in Support of Motion for Summary Judgment ("Pl. Obj."), ECF No. 171, filed Dec. 4, 2024.
[224] Fed. R. Civ. P. 56 (c)(2).

"This does not mean that evidence must be submitted 'in a form that would be admissible at trial.'"[225] Instead, only "the content or substance of the evidence must be admissible."[226]

Ibkul's objections do not state that any of Alfwear's evidence cannot be presented at trial. It only lists exhibits and briefly states that it objects.[227] The cursory objections lack specificity and do not provide an adequate basis for the court to grant them. Furthermore, Ibkul does not argue that any of the evidence cannot be presented in a form that may be admissible in evidence. Accordingly, the court overrules these objections for purposes of ruling on the parties' summary judgment motions.

Next, Alfwear objects to declarations submitted by Ibkul in support of its Motion for Summary Judgment.[228] Ibkul attached a declaration by Mr. Handler to its Reply in Support and later filed a declaration by Mr. Gauba.[229] Alfwear argues that the declarations are irrelevant, improper opinion testimony, or are made without sufficient personal knowledge.[230] It also objects to Mr. Gauba's declaration as untimely.[231]

A party may use a declaration to support or oppose a motion for summary judgment so long as it is "made on personal knowledge, set[s] out facts that would be admissible in evidence, and show[s] that the affiant or declarant is competent to testify on the matters stated."[232] "At the

---

[225] *Trevizo v. Adams*, 455 F.3d 1155, 1160 (10th Cir. 2006) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).
[226] *Brown v. Perez*, 835 F.3d 1223, 1232 (10th Cir. 2016), *as amended on reh'g* (Nov. 8, 2016) (quoting *Argo v. Blue Cross & Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006)).
[227] Def. MSJ Reply 11–13.
[228] Pl. Obj. 2.
[229] Reply Declaration of Jamie Handler in Support of Defendants' Motion for Summary Judgment ("Handler Dec."), ECF No. 161-1, filed Nov. 22, 2024; Reply Declaration of Anurag Gauba in Support of Defendants' Motion for Summary Judgment ("Gauba Dec."), ECF No. 165, filed Nov. 24, 2025.
[230] Pl. Obj. 2, 4.
[231] *Id.* at 4.
[232] Fed. R. Civ. P. 56 (c)(4).

summary judgment stage, '[t]he only appropriate basis on which to raise an evidentiary objection. . . is that a fact cannot be presented in a form that would be admissible in evidence.'"[233] "Declarations attached to a reply brief are proper and satisfy the moving party's burden to explain why the material is admissible if the non-moving party has made admissibility objections."[234]

Although Alfwear offers several objections to Mr. Handler and Mr. Gauba's declarations, it does not argue that any of the statements in the declarations cannot be presented in a form that would be admissible at trial. The declarations state that Mr. Handler and Ms. Gauba have made their statements based on personal knowledge and list their qualifications.[235] Alfwear also does not explain why Mr. Gauba's declaration being filed two days after Ibkul's reply memorandum means the court should not consider it. Accordingly, its objections to the Ibkul declarations are overruled.

Ibkul also requests that the court judicially notice the content of the parties' briefing.[236] It requests judicial notice in an effort to incorporate arguments made in one motion into another.[237] "[I]t is not appropriate for a party to attempt to expand applicable briefing limits by referencing voluminous prior briefing."[238] If it wanted to make additional or expanded arguments, it could

---

[233] *Juliano v. Engel*, No. 2:23-CV-351-TS-CMR, 2025 WL 315880, at *2 (D. Utah 2025) (quoting *United States v. RaPower-3, LLC*, No. 2:15-CV-00828-DN, 2020 WL 5531563, at *15 (D. Utah 2020)).

[234] *United States v. RaPower-3, LLC*, No. 2:15-CV-00828-DN, 2020 WL 5531563, at *18 (D. Utah 2020) (citing *Stella v. Davis Cnty.*, No. 1:18-CV-002, 2019 WL 4601611, at *4 n.5 (D. Utah 2019).

[235] Handler Dec. 2; Gauba Dec. 2.

[236] Defendants' Request for Judicial Notice and Non-Opposition to Plaintiff's Motion to File Overlength Brief in Opposition to Defendants' Motion for Summary Judgment, ECF No. 142, filed Nov. 5, 2024.

[237] Defendants' Opposition to Plaintiff's Motion for Partial Summary Judgment ("Def. MSJ Opp.") 8, ECF No. 149, filed Nov. 8, 2024.

[238] *KeyBank Nat'l Ass'n v. Williams*, No. 19-CV-03714-CMA-SKC, 2022 WL 4549473, at *3 (D. Colo. 2022) (citing *Hudson Assocs. Consulting, Inc. v. Weidner*, 06-cv-2461-EFM, 2010 WL 1946414, at *2 (D. Kan. 2010)).

have sought additional pages for its briefing. Accordingly, Ibkul's request for judicial notice is denied.

## I.    Alfwear's Motion for Partial Summary Judgment

Alfwear argues that it is entitled to summary judgment on the first element of its trademark claims, arguing that it has a protectable interest in the KÜHL mark. It also moves for summary judgment on three of Ibkul's affirmative defenses. The court addresses each in turn.

### A.  Protectable Interest

Alfwear moves for summary judgment on the first element of its trademark claims—whether it has a protectable interest in the KÜHL mark.[239] It argues that the KÜHL mark is incontestable, that it is inherently distinctive, and that it made actual use of the KÜHL mark before any use of the IBKÜL mark.[240] Ibkul responds that there are disputed facts on whether Alfwear has a protectable interest in the KÜHL mark.[241]

"Incontestability establishes a plaintiff's right to use a trademark, subject only to certain enumerated defenses."[242] "A registered trademark, even a descriptive mark, may become incontestable if it has been in continuous use for five years following the date of its registration. Once a mark has become incontestable, its registration constitutes 'conclusive evidence' of the holder's right to use the mark."[243] Registered marks that have been in continuous use for five years are incontestable, provided that:

---

[239] Pl. MSJ 2.
[240] *Id.* at 8.
[241] Def. MSJ Opp. 6.
[242] *Coherent, Inc. v. Coherent Techs., Inc.*, 935 F.2d 1122, 1124 (10th Cir. 1991) (citing 15 U.S.C. §§ 1115(b)(1)–1115(b)(8)).
[243] *Beer Nuts, Inc. v. Clover Club Foods Co.*, 805 F.2d 920, 924 (10th Cir. 1986) (citing 15 U.S.C. § 1065).

(1) there has been no final decision adverse to the owner's claim of ownership of such mark for such goods or services, or to the owner's right to register the same or to keep the same on the register; and
(2) there is no proceeding involving said rights pending in the United States Patent and Trademark Office or in a court and not finally disposed of; and
(3) an affidavit is filed with the Director within one year after the expiration of any such five-year period setting forth those goods or services stated in the registration on or in connection with which such mark has been in continuous use for such five consecutive years and is still in use in commerce, and other matters specified in paragraphs (1) and (2) hereof; and
(4) no incontestable right shall be acquired in a mark which is the generic name for the goods or services or a portion thereof, for which it is registered.[244]

Trademark registrations remain in force for 10 years, and owners may maintain their trademarks by submitting an affidavit to the United States Patent and Trademark Office (the "USPTO") within specified time periods.[245] Incontestable trademarks are still subject to nine statutory defenses or defects under 15 U.S.C. § 1115, including fraud in obtaining the mark, abandonment, and equitable defenses.[246] The party challenging the incontestability of a mark bears the burden to plead and prove any of the statutory exceptions to incontestability.[247]

Alfwear obtained a registration for the 2011 mark on February 8, 2011.[248] Alfwear then filed a Declaration of Use and Incontestability for the 2011 mark on January 16, 2017.[249] Alfwear did not submit an affidavit to renew its trademark in 2021, and the USPTO recorded the registration as canceled and expired on September 10, 2021.[250] The next day, Alfwear filed a petition with the USPTO requesting that the 2011 mark be reinstated.[251] On April 15, 2022, the

---

[244] 15 U.S.C. § 1065.
[245] 15 U.S.C. § 1058 (a).
[246] 15 U.S.C. § 1115 (b).
[247] 5 McCarthy on Trademarks and Unfair Competition § 32:149 (5th ed.).
[248] U.S. Trademark Registration No. 3,916,866, registered Feb. 8, 2011, ECF No. 123-2, filed Oct. 11, 2024.
[249] Combined Declaration of Use and Incontestability under Sections 8 & 15, ECF No. 123-4, filed Oct. 11, 2024.
[250] Petition to Director Inquiry Letter, ECF No. 160-12, filed Nov. 22, 2024.
[251] Petition Decision, ECF No. 160-15, filed Nov. 22, 2024.

USPTO granted Alfwear's petition to have the 2011 mark reinstated.[252] Alfwear then withdrew the January 16, 2017, affidavit because of pending matters before the Trademark Trial and Appeal Board, stating that it intended to resubmit an affidavit after the proceeding's completion.[253] As recently as September 2024, the USPTO website shows that the 2011 mark's registration is active.[254]

Ibkul argues that Alfwear's 2011 mark is not incontestable because Alfwear withdrew its declaration of incontestability from the United States Patent and Trademark Office.[255] Although Ibkul does not reference any statutory basis, it seems to argue that Alfwear abandoned the 2011 mark, so it is not incontestable.[256]

A mark is "abandoned" if "its use has been discontinued with intent not to resume such use."[257] Ibkul has not provided any evidence that Alfwear has stopped using the 2011 mark. Alfwear argues that it has not abandoned the mark because it has sold products with the 2011 mark every year since its registration and provides evidence of these sales.[258] Ibkul does not counter this evidence; therefore, it has failed to meet its burden to prove the 2011 mark has been abandoned.

Ibkul then argues that Alfwear made fraudulent statements to the USPTO to keep the mark registered. It states that Alfwear's "COVID statements in its September 11, 2021, Petition

---

[252] Petition to Director Granted, ECF 150-9, filed Nov. 8, 2024.
[253] Response to Office Action for Post-Registration Matters, ECF No. 150-11, filed Nov. 8, 2024.
[254] USPTO TSDR Report for KHL registration (Reg. No. 3,916,866), dated September 13, 2024, ECF 123-3, filed Oct. 11, 2024.
[255] Def. MSJ Opp. 20–21.
[256] *Id.*
[257] 15 U.S.C. § 1127.
[258] Pl. MSJ 9; *see also* KHL Sales by Category, ECF 125-3, filed Oct. 11, 2024.

were fraudulent."[259] It further claims that Alfwear's statements in the April 7, 2022, statement to the USPTO were fraudulent.[260] Alfwear responds that there is no genuine dispute of fact as to whether it made fraudulent statements.[261]

An incontestable trademark "may be cancelled if its registration was obtained fraudulently."[262] However, courts "should not lightly undertake cancellation on the basis of fraud, and the burden of proving fraudulent procurement of a registration is heavy."[263] "Any deliberate attempt to mislead the [USPTO] must be established by clear and convincing evidence."[264]

Ibkul relies on the court's previous order granting Alfwear's motion to dismiss Ibkul's amended counterclaim to advance its fraud arguments.[265] There, the court held that although Ibkul had plausibly alleged "enough to infer the September 11, 2021 statement was false and meant to deceive," it had not alleged enough for the court to infer that the allegedly false statement was material.[266] The court then held that there was no plausible allegation that the April 7, 2022 statements were fraudulent.[267]

---

[259] Def. MSJ Opp. 27.

[260] *Id.* at 31.

[261] Plaintiff's Reply in Support of Motion for Partial Summary Judgment ("Pl. MSJ Reply") 11, ECF No. 160, filed Nov. 22, 2024.

[262] *Beer Nuts, Inc. v. Clover Club Foods Co.*, 711 F.2d 934, 942 (10th Cir. 1983).

[263] *Id.* (citing *Robert V. Vance & Associates, Inc. v. Baronet Corp.,* 487 F.Supp.790, 800 (N.D.Ga. 1979)) (also citing *W.D. Byron & Sons v. Stein Bros. Manufacturing,* 377 F.2d 1001, 1003 (Cust. & Pat.App. 1967)) (internal citations omitted).

[264] *Id.* (citing *Money Store v. Harriscorp Finance, Inc.,* 689 F.2d 666, 670 (7th Cir. 1982) (also citing *Wrist-Rocket Manufacturing Co. v. Saunders Archery Co.,* 516 F.2d 846, 852 (8th Cir. 1975)).

[265] Memorandum Decision and Order Granting Plaintiff's Motion to Dismiss Defendants' Amended Counterclaim ("MTD Order"), ECF No. 77, filed May 5, 2023.

[266] *Id.* at 15–16.

[267] *Id.* at 17.

Ibkul now argues that the September 11, 2021 statement was material and that the April 7, 2022 statement was fraudulent. But Ibkul has not submitted any evidence that could establish that any statement made by Alfwear was fraudulent. It only references the statements themselves, which do not show that Alfwear intended to mislead the USPTO. Accordingly, Ibkul has failed to carry its burden to demonstrate fraud as a basis for challenging the incontestability of the 2011 mark.

Next, Ibkul offers a series of alleged "defects" in the USPTO process that have made the 2011 mark not incontestable.[268] Alfwear responds that any alleged defects do not create a genuine dispute as to the validity of the 2011 mark because they are not defenses or defects that Ibkul can assert under the Lanham Act.[269]

Ibkul does not specify which statutory basis to challenge an incontestable mark these alleged defects fall under. Section 1115 does not state that any defects in the USPTO process are a basis for challenging an incontestable mark beyond the fraud exception.[270] As previously discussed, Ibkul has not produced evidence demonstrating that Alfwear submitted fraudulent statements to the USPTO. Accordingly, any alleged defects in the USPTO process are not a basis to find the 2011 mark not incontestable.

Finally, Ibkul argues that the 2011 mark "fails to function as a trademark or is generic and should be disclaimed."[271] It argues that the KÜHL mark, when translated as "cool", describes

---

[268] Def. MSJ Opp. 23 (2011 mark was "cancelled"); 24 (USPTO had no power to reinstate cancelled registration); 25 (director of USPTO had no power to give extension, USPTO found COVID statements in September 11, 2021, petition insufficient); 28 (petition was granted after CARES Act expired); 32 (USPTO did not issue formal notice of acceptance).
[269] Pl. MSJ Reply 10.
[270] 15 U.S.C. § 1115 (b).
[271] Def. MSJ Opp. 34.

Alfwear's clothing and does not function as a trademark.[272] Like with its procedural claims, the 2011 mark's alleged failure to function as a trademark or its generic nature is not a basis to find the mark is not incontestable.[273] Ibkul offers arguments that may be used to challenge the strength of the mark, but it does not advance any reason to find the mark incontestable. Accordingly, it has failed to overcome the presumption that the 2011 mark is incontestable.

In sum, Alfwear has shown that the KÜHL mark is incontestable. Its registration "constitutes 'conclusive evidence'" of Alfwear's right to use the KÜHL mark.[274] Accordingly, Alfwear has established that it has an enforceable right in the KÜHL mark and has met its burden on the first element of its trademark claims. Its motion for partial summary judgment is granted as to the incontestability of the KÜHL mark.

### B. Affirmative Defenses

Alfwear next moves for summary judgment on three affirmative defenses advanced by Ibkul.[275] In its answer, Ibkul asserted that Alfwear's claims are barred by res judicata, the fair use doctrine, and the statute of limitations.[276] Ibkul opposes summary judgment on all three defenses.

---

[272] *Id.* at 35.

[273] Section 1115(b)(8) lists a defense that the "mark is functional." This defense requires the challenger to show that the product feature "is essential to the use or purpose of the article" or "affects the cost or quality of the article." *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 32 (2001) (quoting *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 165 (1995)). Ibkul does not mention this test, and its arguments do not fulfill these factors. Accordingly, even if Ibkul meant to invoke the 15 U.S.C. § 1115 (b)(9) defense without expressly stating so, it has failed to raise a dispute of material fact on whether any KÜHL product is functional.

[274] *Beer Nuts, Inc. v. Clover Club Foods Co.*, 805 F.2d 920, 924 (10th Cir. 1986) (citing 15 U.S.C. § 1065).

[275] Answer, ECF No. 53, filed Sep. 9, 2022.

[276] *Id.* at 29–30.

### i.    Issue Preclusion

In its answer, Ibkul asserts that Alfwear's claims "are barred in whole or in part by the doctrines of *res judicata*, claim preclusion, collateral estoppel or issue preclusion."[277] Ibkul argues that the court should rely on two previous decisions that held the KÜHL mark is not famous to find that the mark is not famous in this case.[278] Alfwear disagrees, contending that the court should not rely on either decision and should grant it summary judgment on Ibkul's issue preclusion defense.[279]

The first case is the proceeding before the Trademark Trial and Appeal Board ("TTAB") between Alfwear and Ibkul. In that proceeding, the TTAB found that the evidence did not clearly establish that the KÜHL mark was famous.[280] Ibkul argues the court should apply this finding by the TTAB in this case.

"[A] court should give preclusive effect to TTAB decisions if the ordinary elements of issue preclusion are met."[281] "[T]he general rule is that '[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim.'"[282] However, if an appeals court has vacated a decision, it

---

[277] Answer 29.
[278] Def. MSJ Opp. 47.
[279] Pl. MSJ 11.
[280] *Alfwear, Inc. v. Ibkul Ubhot Ltd.*, No. 91233985, 2020 WL 3429163, at *16 (June 2, 2020).
[281] *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 141–42 (2015).
[282] *Id.* at 148 (quoting Restatement (Second) of Judgments § 27, p. 250 (1980)).

"removes the preclusive effect (if any) of the vacated judgments."[283] The 2020 TTAB decision

was vacated by the Federal Circuit.[284] Accordingly, the TTAB decision has no precedential value.

The second case Ibkul relies on for preclusive effect is a decision from the District of

Utah holding that the KÜHL mark is not famous.[285] In *Alfwear, Inc. v. Mast-Jägermeister US,

Inc.*, the court held that Alfwear had "not provided evidence that would allow a reasonable juror

to find that its mark is famous" and granted summary judgment in favor of defendant Mast-

Jägermeister.[286] For the court to apply offensive non-mutual issue preclusion, Ibkul must show:

> (1) the issue previously decided is identical with the one presented in the action in
> question, (2) the prior action has been finally adjudicated on the merits, (3) the
> party against whom the doctrine is invoked was a party, or in privity with a party,
> to the prior adjudication, and (4) the party against whom the doctrine is raised had
> a full and fair opportunity to litigate the issue in the prior action.[287]

Even if these factors have been met, "[a]dditional considerations apply when a nonparty to the

prior adjudication attempts to invoke issue preclusion."[288] Courts have "broad discretion" in

deciding whether to apply non-mutual issue preclusion and should avoid doing so where

preclusion would be "unfair" to the nonmovant.[289]

Alfwear argues that Defendants have not shown that the *Mast-Jägermeister* decision

involved an identical issue to the one in this case. And there are marked differences between the

---

[283] *Boyce v. Ashcroft*, 268 F.3d 953, 955 (10th Cir. 2001); *see also Kosinski v. Comm'r*, 541 F.3d 671, 676 (6th Cir. 2008) ("Only final judgments, not surprisingly, possess issue-preclusive power, and a judgment that has been vacated, reversed, or set aside on appeal is thereby deprived of all conclusive effect, both as res judicata and as collateral estoppel.") (internal citations omitted).

[284] *IBKUL UBHOT LTD. v. Alfwear, Inc.*, No. 2020-2120, 2021 WL 4772792, at *1 (Fed. Cir. Oct. 13, 2021).

[285] Def. MSJ Opp. 149.

[286] No. 2:12-CV-00936-TC-DBP, 2021 WL 364109, at *10 (D. Utah 2021), *aff'd sub nom. Alfwear, Inc. v. Mast-Jaegermeister US, Inc.*, No. 21-4029, 2023 WL 5765891 (10th Cir. 2023).

[287] *Park Lake Res. Ltd. Liab. v. U.S. Dep't Of Agr.*, 378 F.3d 1132, 1136 (10th Cir. 2004) (citations omitted).

[288] *Gulf Coast Shippers Ltd. P'ship v. DHL Exp. (USA), Inc.*, No. 2:09-CV-00221, 2015 WL 4557573, at *7 (D. Utah 2015).

[289] *Id.* (citing *Dodge v. Cotter Corp.*, 203 F.3d 1190, 1198 (10th Cir. 2000)).

disputes. Alfwear brought trademark infringement and related claims against Mast-Jägermeister, the United States distributor of a German herbal liquor, based on its use of the word "KÜHL" in its advertising.[290] The court considered the fame of the KÜHL mark to assess Alfwear's dilution claim, finding that "[a]t best, KÜHL is famous only within the niche outdoor clothing market."[291]

But these differences do not establish that Alfwear should be granted summary judgment on this affirmative defense. First, the issue of whether the KÜHL mark was famous in *Mast-Jägermeister* is identical to the issue in this case. The court considered the fame of the KÜHL mark beginning in 2016, when Mast-Jägermeister began using the word "KÜHL." The timeframe for measuring fame is identical here, as Ibkul began using the IBKÜL mark in 2016.[292] The evidence considered by the *Mast-Jägermeister* court on the KÜHL mark's fame, including Alfwear's total sales, retail partners, and advertisements, is the same evidence that should be considered in this case.

Second, the *Mast-Jägermeister* action has been finally adjudicated on the merits. The district court granted summary judgment in favor of Mast-Jägermeister, which the Tenth Circuit affirmed.[293] Third, the plaintiff is Alfwear in both cases. Finally, Alfwear had a full and fair opportunity to litigate whether the KÜHL mark was famous in the prior action. Alfwear does not argue that it was deprived of this opportunity by the district court, and there is no indication in

---

[290] *Alfwear, Inc. v. Mast-Jagermeister US, Inc.*, No. 2:12-CV-00936-TC-DBP, 2021 WL 364109, at *4 (D. Utah 2021), *aff'd sub nom. Alfwear, Inc. v. Mast-Jagermeister US, Inc.*, No. 21-4029, 2023 WL 5765891 (10th Cir. 2023).
[291] *Id.* at *10.
[292] Second Supplemental Responses to Plaintiff's First Set of Interrogatories 3, ECF No. 128-27, filed Oct. 11, 2024.
[293] *Alfwear, Inc. v. Mast-Jaegermeister US, Inc.*, No. 21-4029, 2023 WL 5765891, at *16 (10th Cir. 2023).

the record that supports a different finding.[294] Accordingly, Alfwear has not established that the

court should grant it summary judgment on Ibkul's issue preclusion defense.

### ii.    Fair Use

The Lanham Act's "fair use" defense "permits the use of a name or term, other than as a

trademark, that is descriptive and is used fairly and in good faith only to describe the goods."[295]

To prove the affirmative defense of fair use, a defendant must establish that they are not using

the name or term as a trademark or service mark, that the name or term is descriptive of the

goods or services of the defendant, and that such descriptive use is fair and made in good

faith.[296]

Alfwear contends that it should be granted summary judgment on Ibkul's fair use

defense. It argues that Ibkul lacks evidence showing that it does not use the IBKÜL mark as a

trademark or that the IBKÜL mark does not describe its products.[297] Ibkul responds that there are

genuine issues of fact on both elements of its fair use defense.[298]

"A term or symbol is used as a trademark when the producer uses it to identify the source

of his goods to the public and to distinguish those goods from others."[299] Ibkul does not point to

any evidence in the record to show that it is not using the IBKÜL mark as a trademark. Nor

---

[294] Alfwear also argues that Ibkul should not be able to use non-mutual offensive issue preclusion based on the *Mast-Jägermeister* decision because Ibkul did not "identify that decision as a basis for their Res Judicata Defense before the summary judgment deadline." *See* Pl. MSJ Reply 17. Alfwear does not explain why this is a basis for the court to grant it summary judgment on this issue, and the court does not further address the argument.

[295] *Beer Nuts, Inc.*, 711 F.2d at 937 (citing 15 U.S.C. § 1115 (b)(4)) (emphasis omitted).

[296] *See Overstock.com, Inc. v. Nomorerack.com, Inc.*, No. 2:13-CV-1095 TS, 2014 WL 2946646, at *8 (D. Utah 2014) (citing *Coherent, Inc. v. Coherent Techs., Inc.*, 736 F. Supp. 1055, 1061 (D. Colo. 1990), *aff'd*, 935 F.2d 1122 (10th Cir. 1991)).

[297] PL. MSJ 13–14.

[298] Def. MSJ Opp. 48.

[299] *Beer Nuts, Inc.*, 711 F.2d at 938 (citing *M. B. H. Enterprises, Inc. v. WOKY, Inc.*, 633 F.2d 50, 53–54 (7th Cir. 1980)).

could it, given its repeated arguments that IBKÜL is a trademark and evidence showing the mark on Ibkul's products.[300] Accordingly, there is no dispute of fact and Alfwear is granted summary judgment on Ibkul's fair use defense.

### iii.    Statute of Limitations

Alfwear argues it should be granted summary judgment on Ibkul's statute of limitations defense relating to Alfwear's federal claims. It points out that the Lanham Act does not have a statute of limitations to argue that Ibkul's affirmative defense should fail as a matter of law.[301] Ibkul argues that Alfwear's claims are barred by laches and the statute of limitations, applying Utah's limitations period for fraud.[302]

As an initial matter, Ibkul is barred from asserting a laches defense. Its answer states that Alfwear "seeks relief outside the relevant statutes of limitation" without mentioning laches.[303] Federal Rule of Civil Procedure 8 lists laches and the statute of limitations as separate defenses which must be affirmatively stated.[304] Ibkul did not raise a laches defense in its answer; accordingly, this defense has been waived.[305]

Alfwear next argues that Ibkul cannot bring a statute of limitations defense because the Lanham Act does not have a statute of limitations.[306] Ibkul contends that Utah's three-year statute of limitations for fraud is analogous and should apply in this case.[307]

---

[300] *See* Def. MSJ 8 (displaying IBKÜL mark and identifying it as a trademark).
[301] Pl. MSJ 15.
[302] Def. MSJ Opp. 50.
[303] Answer 30.
[304] Fed. R. Civ. P. 8 (c)(1).
[305] *See Renfro v. City of Emporia, Kan.*, 948 F.2d 1529, 1539 (10th Cir. 1991) (Rule 8 "requires that affirmative defenses be pleaded or they are deemed waived.").
[306] Pl. MSJ 7.
[307] Def. MSJ Opp. 50.

The Lanham Act does not specify a statute of limitations for trademark claims.[308] Instead, it states that "equitable principles, including laches. . . are applicable."[309] The Tenth Circuit has not directly addressed the statute of limitations for trademark claims, however, it has opined that "civil statutes such as the Lanham Act [] are sometimes held to incorporate analogous state-law limitations periods."[310] It has also stated in an unpublished opinion that "[i]n dealing with Lanham Act claims courts have looked to analogous state limitation provisions and invoked presumptions in favor of (or against) laches defenses to claims brought outside (or inside) the analogous limitations period."[311]

Cases in this district have taken a variety of approaches to the timeliness of Lanham Act claims and whether analogous state law statutes of limitations apply. In *Icon Health & Fitness, Inc. v. Nautilus Group, Inc.*, the court stated that "[b]ecause the Lanham Act does not contain a statute of limitations, courts have uniformly applied the doctrine of laches (an equitable principle) to determine if false advertising claims should be barred."[312] Later, in *Albion International, Inc. v. American International Chemical, Inc.*, the court applied the presumption of laches when evaluating Lanham Act claims.[313] It referred to Utah's statute of limitations for fraud because neither party disputed that it should be referenced.[314] Then, in *J. White, L.C. v. Wiseman*, this court relied on *Albion* for the proposition that "[c]ourts have applied the state fraud claims statute of limitations when determining the limitations period applicable to a

---

[308] *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 678 n. 15 (2014) (citing 15 U.S.C. § 1115 (b)(9)) (Lanham Act "contains no statute of limitations" but provides for "defensive use of equitable principles").
[309] 15 U.S.C. § 1115 (b)(9).
[310] *United States v. Foote*, 413 F.3d 1240, 1247 (10th Cir. 2005).
[311] *Yeager v. Fort Knox Sec. Prods.*, 602 F. App'x 423, 431 (10th Cir. 2015) (unpublished).
[312] No. 1:02CV00109TC, 2004 WL 6031124, at *19 (D. Utah 2004).
[313] 2:07-CV-0994 CW, 2012 WL 3776866, at *4 (D. Utah 2012).
[314] *Id.* at * 5.

Lanham Act false advertising claim."[315] Most recently in *Ariix LLC v. Usana Health Sciences, Inc.*, the court held that without clear guidance from the Tenth Circuit "on whether a statute of limitations is available under the Lanham Act, and how to apply such a defense, this court. . . analyzes the timeliness of [plaintiff's] Lanham Act claim under the doctrine of laches."[316]

Although Ibkul argues that the three-year fraud statute of limitations should apply, it has not explained why beyond citing *White*, *Albion*, and *Icon*. But in *Icon* and *Albion* the court analyzed the timeliness of the plaintiff's claims under the doctrine of laches.[317]  Moreover, in those cases the court was evaluating false advertising claims under the Lanham Act, not trademark infringement claims. Cases from this district that reference a statute of limitations for Lanham Act claims regularly apply laches and have not addressed infringement claims. As such, they are distinguishable and generally unhelpful to Ibkul's argument.

Even if the court were to construe Ibkul's answer to include a laches defense, Ibkul still would have failed to identify any material dispute that may prevent summary judgment on the defense. "In order to prove the affirmative defense of laches, the defendant must demonstrate that there has been an unreasonable delay in asserting the claim and that the defendant was materially prejudiced by that delay."[318] It requires "not mere delay, but delay that works a disadvantage to the other party."[319]

---

[315] No. 216CV01179DBBJCB, 2020 WL 3922977, at *5 (D. Utah 2020).
[316] No. 222CV00313JNPDAO, 2023 WL 2574319, at *6 (D. Utah 2023).
[317] *Id.* (discussing *Icon* and *Albion*).
[318] *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 949 (10th Cir. 2002) (quoting *Hutchinson v. Pfeil*, 105 F.3d 562, 564 (10th Cir. 1997)).
[319] *United States v. Rodriguez-Aguirre*, 264 F.3d 1195, 1208 (10th Cir. 2001) (quoting *Hutchinson v. Pfeil*, 105 F.3d at 564).

Ibkul has not argued that Alfwear was not diligent in bringing this case or articulated how it has been harmed by any delay. Ibkul does not point to any record evidence that shows Alfwear delayed in bringing this suit or to demonstrate harm caused by a delay. Accordingly, Alfwear's motion for summary judgment on Ibkul's statute of limitations defense as applied to its federal claims is granted.

In sum, Alfwear's motion for partial summary judgment on its protectable interest in the KÜHL mark and Ibkul's fair use and statute of limitations defenses is granted. Alfwear's motion for summary judgment on Ibkul's issue preclusion defense is denied.

## II. Ibkul's Motion for Summary Judgment

Ibkul moves for summary judgment on Alfwear's trademark infringement claims. Before evaluating the parties' arguments, the court addresses Alfwear's Rule 26 arguments.

### A. Rule 26

In its motion for summary judgment, Ibkul relies on the declarations of several of its independent sales representatives to support its argument that there has been no consumer confusion.[320] Alfwear objects to Ibkul's reliance on these declarations because Ibkul failed to disclose these sales representatives as witnesses.[321]

Federal Rule of Civil Procedure 26 requires that parties must provide the name and contact information for any individual who is likely to have discoverable information as part of its initial disclosures.[322] "The aim of Rule 26(a)(1). . . is to identify at the outset those persons

---

[320] Def. MSJ ¶¶ 15–23.
[321] Plaintiff's Opposition to Defendants' Motion for Summary Judgment ("Pl. MSJ Opp.") 8, ECF No. 146, filed Nov. 8, 2024.
[322] Fed. R. Civ. P. 26 (a)(1)(A)(i).

that may have any information relevant to the case in order to allow for a complete investigation by all parties, thus allowing parties to depose, interview, or subpoena documents of such individuals during the period of time set aside for discovery."[323] Initial disclosures must be supplemented if a party learns additional information during the discovery process.[324] "A party that fails to disclose witnesses or documents in its initial disclosures is not allowed to use those witnesses or documents in its case unless the failure to disclose was substantially justified or is harmless."[325]

In its initial disclosures, Ibkul listed only Mr. Gauba and Mr. Handler as individuals who had knowledge regarding the likelihood of confusion.[326] In a response to Alfwear's second set of interrogatories, Ibkul stated that it "uses sales representatives to market or promote goods marked IBKUL,"[327] but it did not name or list any sales representative. Ibkul then disclosed the names of its current independent sales representatives in response to Alfwear's third set of interrogatories, which is dated August 9, 2024.[328] This interrogatory response does not provide the sales representatives' contact information or state that these individuals may be used to support Ibkul's claims or defenses as required by Rule 26.

The record shows that Ibkul has failed to comply with its obligations under Rule 26. It never disclosed the sales representatives as individuals who it would rely upon to support its

---

[323] *Phillip M. Adams & Assocs., LLC v. Winbond Elecs. Corp.*, No. 1:05-CV-64 TS, 2010 WL 3239331, at *1 (D. Utah 2010) (quoting *Quesenberry v. Volvo Grp. N. Am., Inc.*, 267 F.R.D. 475, 480 (W.D. Va. 2010)) (emphasis omitted).

[324] Fed. R. Civ. P. 26 (e)(1)(A).

[325] *King v. Citizens Disability LLC*, No. CV 17-0427 GBW/WPL, 2017 WL 5054741, at *1 (D.N.M. 2017) (citing Fed. R. Civ. P. 37 (c)(1)).

[326] Rule 26(a)(1)(A)-(E) Initial Disclosures of Ibkul Corp. and Ibcool, Inc., ECF No. 146-10, filed Nov. 8, 2024.

[327] Second Supplemental Responses to Plaintiff's First Set of Interrogatories to Defendant Ibkul Corp 4, ECF No. 146-44, filed Nov. 8, 2024.

[328] Defendant Ibkul Corp.'s Responses to Plaintiff's Third Set of Interrogatories 3, ECF No. 148-9, filed Nov. 8, 2024.

case. It did not disclose these individuals' contact information or otherwise notify Alfwear that

the sales representatives would provide facts that Ibkul would use at summary judgment. Ibkul

prevented Alfwear from deposing or otherwise questioning the declarants about the information

in their declarations. Accordingly, the declarations should be excluded unless this failure by

Ibkul is substantially justified or harmless.

Ibkul argues that Alfwear has not been prejudiced by its failure to disclose the sales

representatives because their existence was known to Alfwear. It argues that it had previously

produced independent sales representative agreements and that the representatives had been

mentioned in Mr. Handler's deposition, so Alfwear "has been generally aware" of the

representatives and has not been prejudiced by the declarations.[329] But Alfwear cannot be

expected to anticipate that Ibkul would rely on these sales representatives merely because Mr.

Handler discussed sales representatives in his deposition.[330] Neither does Ibkul producing

independent sales agreements put Alfwear on notice that declarations by sales representatives

would be relied upon in Ibkul's motion for summary judgment.

Like with its failure to disclose Ms. Holt as an affirmative expert witness, Ibkul's failure

to disclose the sales representatives is neither justified nor harmless. The sales representatives

were not disclosed as witnesses, and the declarations were supplied to Alfwear in August 2024,

after Ms. Holt relied on the declarations in her expert report and after Alfwear might have

---

[329] Defendants' Response to Plaintiff's Evidence Objections 9, ECF No. 162, filed Nov. 22, 2024.
[330] *Watts v. Anthem, Inc.*, No. 18-CV-01732-NYW, 2020 WL 13933266, at *4 (D. Colo. 2020) (striking undisclosed witness affidavit as defendant "had no reason to suspect that Plaintiff would reply on an undisclosed fact witness's affidavit in response to its Motion for Summary Judgment."); *see also Ferreira Oil Properties, LLC v. Indian Creek Res., Inc.*, No. 12-CV-191-F, 2013 WL 11834244, at *3 (D. Wyo. 2013) ("Plaintiff cannot expect the Defendant to anticipate that Plaintiff will rely on a witness, who has not been disclosed, but shows up on a letter or is discussed in a deposition.") (holding that undisclosed witnesses would not be allowed to testify).

deposed any declarant. Accordingly, Ibkul may not rely on these declarations. The court does not

consider any reference to the declarations or reliance upon them in Ibkul's motion for summary

judgment.

### B.  Trademark Infringement Claims

Ibkul first argues that Alfwear's claims for federal trademark infringement under Sections

1114 and 1125 of the Lanham Act and its common law unfair competition claim should be

dismissed because Alfwear has failed to show there is a likelihood of confusion between its

products and Ibkul's products.[331]

"Likelihood of confusion is a question of fact, but the court may grant summary

judgment in appropriate circumstances."[332] "Courts retain an important authority to monitor the

outer limits of substantial similarity within which a jury is permitted to make the factual

determination whether there is a likelihood of confusion."[333] "Of course, summary judgment is

not appropriate if the nonmovant demonstrates a genuine issue of material fact regarding the

likelihood of confusion."[334]

"In evaluating whether there is a likelihood of confusion, we examine six nonexhaustive

factors: (1) evidence of actual confusion; (2) the strength of the contesting mark; (3) the degree

of similarity between the competing marks; (4) the intent of the alleged infringer in adopting the

contested mark; (5) the degree of care that consumers are likely to exercise in purchasing the

parties' products; and (6) the similarity of the parties' products and the manner in which they

---

[331] Def. MSJ 28.
[332] *Water Pik*, 726 F.3d at 1143 (citing *Sally Beauty Co.*, 304 F.3d at 972).
[333] *King of the Mountain Sports, Inc.*, 185 F.3d at 1089 (quoting *Universal Money Centers, Inc.* 22 F.3d at 1530 n.2).
[334] *Big Dog Motorcycles, L.L.C. v. Big Dog Holdings, Inc.*, 402 F. Supp. 2d 1312, 1325 (D. Kan. 2005).

market them."[335] "These factors are interrelated and no one factor is dispositive."[336] "At all times . . . the key inquiry is whether the consumer is likely to be deceived or confused by the similarity of the marks."[337]

### i.    Evidence of Actual Confusion

"[A]ctual confusion in the marketplace is often considered the best evidence of likelihood of confusion," as "such empirical data can be a reality check on the more theoretical analysis under the other factors."[338] "However, 'evidence of some actual confusion does not dictate a finding of likelihood of confusion'. . . a likelihood of confusion requires a probability of confusion, not the mere possibility of confusion."[339] "Evidence of actual confusion is often introduced through the use of surveys, although their evidentiary value depends on the methodology and questions asked."[340] Marks "must be compared in light of what occurs in the marketplace, not in the courtroom."[341] Surveys should be given minimal weight if they use a side-by-side comparison that bears "little resemblance to the actual workings of the marketplace."[342]

Ibkul argues there is insufficient evidence of confusion by echoing their challenges to the Confusion Survey discussed above.[343] It argues that the Confusion Survey's hang tag comparison

---

[335] *Water Pik,* 726 F.3d at 1143 (citing *Vail Assocs., Inc.* 516 F.3d at 863).

[336] *Sally Beauty Co.,* 304 F.3d at 972 (citing *King of the Mountain Sports, Inc.,* 185 F.3d at 1089).

[337] *Water Pik,* 726 F.3d at 1143 (citing *Team Tires Plus, Ltd. v. Tires Plus, Inc.,* 394 F.3d 831, 833 (10th Cir. 2005)).

[338] *Id.* at 1144.

[339] *Alfwear, Inc. v. Mast-Jaegermeister US, Inc.,* No. 21-4029, 2023 WL 5765891, at *8 (10th Cir. 2023) (quoting *Universal Money Centers, Inc.* 22 F.3d at 1535) (also citing *Elvis Presley Enters., Inc. v. Capece,* 141 F.3d 188, 193 (5th Cir. 1998)).

[340] *Water Pik,* 726 F.3d at 1144 (quoting *Vail Assocs., Inc.,* 516 F.3d at 864 n.8).

[341] *Beer Nuts, Inc.,* 711 F.2d at 941 (quoting *James Burrough Ltd. v. Sign of Beefeater, Inc.,* 540 F.2d 266, 275 (7th Cir. 1976)).

[342] *Water Pik,* 726 F.3d at 1147 (citing *Jordache Enterprises,* 828 F.2d at 1488).

[343] Def. MSJ 31. In its argument on the alleged methodological errors in the Harper Report, Ibkul repeatedly relies on Ms. Holt's supplemental declaration that added analysis to her rebuttal report. *See* Def. MSJ Reply 34–38, ECF

does not replicate real-world conditions,[344] that the Survey used the wrong universe,[345] and that it suffers from other methodological errors.[346] Alfwear responds that the Harper Report shows evidence of actual confusion.[347]

At least two design flaws in the Confusion Survey show that it has little evidentiary value. First, the hang tags were presented in isolation in the Harper Study.[348] The photos presented to survey respondents showed only the hang tags without any accompanying pictures of the parties' clothing or other context. No real-world consumer would compare products by only looking at a hang tag and entirely ignoring the product to which the tag is attached. Accordingly, the Confusion Survey's use of hang tags without displaying any actual products diminishes its evidentiary value.

Second, the survey compared the hang tags one after another, even though there is no evidence a consumer would do this in the marketplace.[349] Although there is limited evidence that KÜHL and IBKÜL products were sold at some shared retailers,[350] Alfwear does not point to any evidence showing that the products have ever been sold side by side. And a "survey asking respondents to compare two trademarks does not bear a reasonable similarity to the marketplace unless it reflects a significant number of real world situations in which both marks are likely to

---

No. 161, filed Nov. 22, 2024. As discussed above, the Holt Declaration must be excluded under Rule 37; therefore, the court does not further consider these arguments.

[344] *Id.* at 31.

[345] *Id.* at 35.

[346] *Id.* at 37–38. Ibkul also argues that any anecdotal evidence of confusion should be disregarded. *See* Def. MSJ 39. Alfwear has not referenced any anecdotal evidence of confusion in response to Ibkul's motion for summary judgment; therefore, the court does not further address this argument

[347] Pl. MSJ Opp. 39.

[348] *See* Harper Report 54, 60, 72.

[349] *Id.* at 21–23.

[350] Plaintiff Alfwear Inc.'s Answers to Defendant Ibcool Inc.'s First Set of Interrogatories 6, ECF 148-11, filed Nov. 8, 2024; Nathan Fay 30(b)(6) Deposition 53:1–17, ECF 148-7, filed Nov. 8, 2024 (listing two retailers that sell both parties' goods).

be seen in the marketplace sequentially or side-by-side."[351] Without any evidence that customers

would encounter KÜHL and IBKÜL products together, the court cannot find the survey recreated

real-world conditions.

Essentially, the survey asked participants to compare KÜHL and IBKÜL in a way they

would not compare them in the marketplace. Consumers would not compare hang tags without

ever seeing the product they were attached to. And no evidence has been identified that

consumers would see KÜHL and IBKÜL products next to each other at any retailer. Accordingly,

the Confusion Survey does not recreate real-world conditions and has little evidentiary value.

Alfwear does not reference any other record evidence to show actual confusion.[352] Therefore,

this factor favors Ibkul.

### ii.    Strength of the Contesting Mark

Ibkul next argues that Alfwear's KÜHL mark is conceptually weak because there are

hundreds of trademark variations that contain the word "cool" or phonetic equivalents.[353] It also

argues that KÜHL is a descriptive or suggestive mark that is relatively weak on the commercial

scale.[354] Alfwear argues that the KÜHL mark is suggestive and commercially strong.

"Likelihood of confusion depends partly on the senior mark's strength—that is, its

'capacity to indicate the source of the goods or services with which it is used.'"[355] "The stronger

the mark, the greater the likelihood that encroachment on the mark will cause confusion."[356] "On

---

[351] *Elevate Fed. Credit Union*, <u>67 F.4th at 1068</u> (quoting 6 J. Thomas McCarthy, McCarthy on Trademarks and
Unfair Competition <u>§ 32:174.50</u> (5th ed. Supp. 2023)).
[352] Pl. MSJ Opp. 39–41.
[353] Def. MSJ 42.
[354] *Id.* Ibkul relies on the Fame Survey in the Holt Report to further this argument. The court does not consider any
reference to or arguments based upon the Fame Survey, as it has been excluded.
[355] *Water Pik*, <u>726 F.3d at 1151</u> (quoting Restatement (Third) of Unfair Competition <u>§ 21 cmt. *i*</u> (1995)).
[356] *Sally Beauty Co.*, <u>304 F.3d at 975</u> (citing *King of the Mountain Sports, Inc.*, <u>185 F.3d at 1093</u>).

the other hand, if a mark is weak, use of a similar mark even on similar goods is unlikely to cause confusion if minor differences distinguish one party's mark from another."[357]

Ibkul first argues that the KÜHL mark is weak because many federal trademarks use the word "cool" or phonetic equivalents such as "kul" or "kool."[358] It provides evidence that there are registered trademarks using "cool" or a similar phrase as shown on the USPTO website.[359] Alfwear responds that these other trademarks are irrelevant and do not show that any similar mark is being used in commerce.[360]

"A strong trademark is one that is rarely used by parties other than the owners of the trademark, while a weak trademark is one that is often used by other parties. The greater the number of identical or more or less similar trademarks already in use on different kinds of goods, the less is the likelihood of confusion between any two specific goods incorporating the weak mark."[361] However, third-party registrations are not evidence of the strength or weakness of a mark.[362] Trademark strength depends on public perception, and trademark registrations "have no impact on public perception.[363] To show a mark is weak based on third party registrations, a

---

[357] *Water Pik*, 726 F.3d at 1151 (citing *First Sav. Bank, F.S.B. v. First Bank Sys., Inc.*, 101 F.3d 645, 655 (10th Cir. 1996)).

[358] Def. MSJ 42. Ibkul also argues that the KÜHL mark is conceptually weak under the doctrine of foreign equivalents. *See* Def. MSJ Reply 45. This doctrine applies to words "commonly used in another language as the generic name of a product." *See* 2 McCarthy on Trademarks and Unfair Competition § 12:41 (5th ed.). Ibkul does not argue that "cool" is a generic name for any kind of clothing or other product. Accordingly, the court does not address this argument any further.

[359] *Id.* at 42–46.

[360] Pl. MSJ Opp. 67–69.

[361] *Vail Assocs., Inc.*, 516 F.3d at 867 (quoting *Universal Money Centers, Inc.* 22 F.3d at 1533).

[362] 1 McCarthy on Trademarks and Unfair Competition § 11:89 (5th ed.) ("The citation of third party registrations is not proof of third party uses for the purpose of showing a crowded field and relative weakness of a mark."); *see also HealthONE of Denver, Inc. v. UnitedHealth Grp. Inc.*, 872 F. Supp. 2d 1154, 1179 (D. Colo. 2012) ("In any event, third-party registrations are not evidence that such marks are in use or that consumers are familiar with them apart from use analogous to a dictionary entry, these third-party registrations cannot be given great weight in determining the strength of a registration.").

[363] *Id.*; *see also Amoco Oil Co. v. Rainbow Snow, Inc.*, 809 F.2d 656, 658 (10th Cir. 1987) ("It is well established that the basis for trademark rights is the association in the public mind of the mark with goods.").

defendant must show these trademarks are actually used by third parties and are recognized by the public.[364]

Ibkul has presented no evidence of actual use by third parties. Active registration on the USPTO website does not establish that a trademark is being used, much less that it is recognized by the public.[365] Without this evidence, any third-party registrations cannot establish that the KÜHL mark exists in a crowded field or is weakened by similar trademark registrations. Therefore, the KÜHL mark must be evaluated for strength in the marketplace.

"Strength has two aspects: conceptual strength, or the mark's place on the spectrum of distinctiveness, and commercial strength, or its level of recognition in the marketplace."[366] Under the conceptual strength prong, the "categories of trademarks in ascending order of relative strength are: (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful."[367]

A descriptive mark "can receive trademark protection 'only when it has acquired a secondary meaning by becoming distinctive of the [owner's] goods in commerce."[368] "Unlike

---

[364] *AWGI, LLC v. Atlas Trucking Co., LLC*, 998 F.3d 258, 266 (6th Cir. 2021) (quoting *Lucky's Detroit, LLC v. Double L, Inc.*, 533 F. App'x 553, 557 (6th Cir. 2013)) (defendants relying on the third party use of similar marks must show third parties "are actively using the marks, not just the existence of marks in the record."); *Scarves by Vera, Inc. v. Todo Imports Ltd. (Inc.)*, 544 F.2d 1167, 1173–74 (2d Cir. 1976) ("The significance of third-party trademarks depends wholly upon their usage. Defendant introduced no evidence that these trademarks were actually used by third parties, that they were well promoted or that they were recognized by consumers. . . The record does not contain any evidence to support the claim that plaintiff's trademark was weakened by uses of similar marks by third parties.").
[365] *FCOA LLC v. Foremost Title & Escrow Servs. LLC*, 57 F.4th 939, 951 (11th Cir.), *cert. denied*, 144 S. Ct. 103, 217 L. Ed. 2d 28 (2023) ("the mere fact that a mark has been registered or that a business is named in a registry is not evidence of third-party use."); *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1374 (Fed. Cir. 2012) ("the mere existence of federally registered trademarks is insufficient to show that the mark is famous for purposes of dilution because ownership of a registration is not proof of fame.").
[366] *Id.* (citing *King of the Mountain Sports, Inc.*, 185 F.3d at 1093).
[367] *Sally Beauty Co.*, 304 F.3d at 975–76 (citing *Heartsprings, Inc.*, 143 F.3d at 555).
[368] *Water Pik,*, 726 F.3d at 1152 (quoting *Sally Beauty Co.*, 304 F.3d at 976).

descriptive marks, '[s]uggestive, fanciful, and arbitrary marks are considered inherently distinctive' and need not acquire secondary meaning to warrant protection as trademarks."[369] "Suggestive marks are those that suggest some quality or ingredient of the goods."[370] These marks require "the consumer to use imagination and perception to determine the product's nature."[371]

Alfwear argues that the KÜHL mark is "at least suggestive."[372] Ibkul seems to agree, stating that the KÜHL mark is "likely a descriptive mark or a suggestive mark at best."[373] It cites the Tenth Circuit's decision in *Alfwear, Inc. v. Mast- Jägermeister US, Inc.*, where the court did not question the district court's reasoning that the KÜHL mark is suggestive because it "vaguely suggests that Alfwear's clothing products are appropriate in cold or chilly outdoor environments, and that its apparel is cool, hip, and stylish."[374]

The court agrees. The KÜHL mark implies that it has temperature-regulating qualities or that it is in style without expressly stating so. As such, it suggests a quality of KÜHL products without describing the clothing. Therefore, the KÜHL mark is suggestive and does not need to acquire a secondary meaning to warrant protection. However, the inquiry does not end at conceptual strength, and the court must also consider the commercial strength of the KÜHL mark.

---

[369] *Id.*

[370] *King of the Mountain Sports, Inc*, 185 F.3d at 1093 (citing McCarthy on Trademarks and Unfair Competition § 11:12 (4th ed.)).

[371] *First Sav. Bank, F.S.B. v. First Bank Sys., Inc.*, 101 F.3d 645, 655 (10th Cir. 1996) (citing *Champions Golf Club, Inc. v. The Champions Golf Club, Inc.*, 78 F.3d 1111, 1117 (6th Cir. 1996)).

[372] Pl. MSJ Opp. 59.

[373] Def. MSJ 46.

[374] Def. MSJ 47; quoting *Alfwear, Inc. v. Mast-Jaegermeister US, Inc.*, No. 21-4029, 2023 WL 5765891, at *14 (10th Cir. 2023).

"Commercial strength is 'the marketplace recognition value of the mark.'"[375] Relevant factors include "direct evidence, such as consumer surveys or testimony from consumers and circumstantial evidence regarding: (1) the length and manner of the mark's use, (2) the nature and extent of advertising and promotion of the mark and (3) the efforts made in the direction of promoting a conscious connection, in the public's mind, between the name or mark and a particular product or venture."[376]

Ibkul again relies on *Alfwear, Inc. v. Mast- Jägermeister US, Inc.*, where the Tenth Circuit upheld the district court's finding that the KÜHL mark was not commercially strong.[377] There, the court stated that "[r]aw data of the dollar amount Alfwear spends on marketing and the number of users who access its website or follow its Facebook account may not be meaningfully probative of the commercial strength of the KÜHL mark, if we do not have any context to assess how these numbers compare to other competitors, or—perhaps more importantly—to assess whether Alfwear's efforts have generated consumer awareness of the KÜHL mark in the marketplace."[378]

Alfwear relies on similar evidence to show the KÜHL mark is commercially strong in this case. Alfwear has used the KÜHL mark for over thirty years.[379] It has sold over a billion dollars of KÜHL products since 2017.[380] It has also spent millions of dollars on advertisements

---

[375] *Water Pik,* 726 F.3d at 1153 (quoting *King of the Mountain Sports, Inc.*, 185 F.3d at 1093).

[376] *Id.* at 1154 (quoting *Donchez v. Coors Brewing Co.*, 392 F.3d 1211, 1218 (10th Cir. 2004)) (cleaned up).

[377] Def. MSJ Reply 49–51 (quoting *Alfwear, Inc. v. Mast-Jaegermeister US, Inc.*, No. 21-4029, 2023 WL 5765891, at *15–16 (10th Cir. 2023)). Ibkul also cites the Holt Fame Survey and the sales representative declarations to support its argument against the KÜHL mark's commercial strength. *See* Def. MSJ 47–48; Def. MSJ Reply 48–49. As discussed above, the court does not consider these materials or arguments made based upon them.

[378] *Alfwear, Inc. v. Mast-Jaegermeister US, Inc.*, No. 21-4029, 2023 WL 5765891, at *15 (10th Cir. 2023).

[379] Testimony Declaration of Kevin Boyle 6, ECF No. 148-17, filed Nov. 8, 2024.

[380] KHL's Sales, ECF No. 148-12, filed Nov. 8, 2024.

that include the KÜHL mark in the same time period.[381] KÜHL products are available at over a thousand retailers across the United States, including outdoor retailers like Scheels and REI.[382] KÜHL products have also received some online recognition and have been worn by celebrities.[383]

But Alfwear provides no context to assess how these expenditures stack up against KÜHL's competitors or whether consumers are aware of the KÜHL mark in the marketplace. "[M]arks may lack commercial strength despite evidence that 'the senior user's products had millions of users' and the use of 'well-known retailers' to sell these products."[384] This kind of evidence "does not tell us whether the sales were stimulated by the mark."[385] And isolated instances of celebrities wearing clothing featuring a mark does not establish commercial strength.[386]

Alfwear does not mention any of its competitors or offer a comparison of its spending or revenues as compared to competitors. It does not argue that any consumers purchase its products because of the KÜHL mark. And it does not offer any evidence showing that consumers are aware of the KÜHL mark. In general, Alfwear has not produced evidence that may show the KÜHL mark is commercially strong.

---

[381] KHL's Marketing Expenses, ECF 148-14, filed Nov. 8, 2024.
[382] Pl. MSJ Opp. 62.
[383] *Id.* at 65–66.
[384] *Elevate Fed. Credit Union*, 67 F.4th at 1076 (quoting *Water Pik*, 726 F.3d at 1153–54); *see also Forney Indus., Inc. v. Daco of Missouri, Inc.*, 835 F.3d 1238, 1254 (10th Cir. 2016) (advertising and sales data were unconvincing whether they did not show how these expenditures related to the mark).
[385] *Water Pik*, 726 F.3d at 1155.
[386] *Alfwear, Inc. v. Mast-Jagermeister US, Inc.*, No. 2:12-CV-00936-TC-DBP, 2021 WL 364109, at *9 (D. Utah 2021), *aff'd sub nom. Alfwear, Inc. v. Mast-Jaegermeister US, Inc.*, No. 21-4029, 2023 WL 5765891 (10th Cir. 2023) (citing *Poison Spider Bicycles, Inc. v. TAP Mfg., LLC*, No. 2:16-CV-00148, 2018 WL 836364, at *7 (D. Utah 2018)) ("And just because some celebrities wore KÜHL clothing once does not demonstrate that KÜHL is a household name."); *Water Pik*, 726 F.3d at 1155 (products being featured on Oprah Winfrey Show did not establish commercial strength).

Alfwear cites the Tenth Circuit's decision in *Affliction Holdings, LLC v. Utah Vap or Smoke, LLC* to argue that its evidence "far exceeds what is necessary to show commercial strength."[387] There, the court considered whether the trial court's grant of summary judgment to the defendant was warranted. The court noted that plaintiff had sold goods with the mark for over ten years, "had revenues of more than $275 million in the last six years, and spent more than $3.2 million on advertising and marketing" in a similar time frame.[388] "Drawing all inferences in favor of [defendant] at this stage," the court summarily found that the mark had commercial strength. Alfwear may have similar profits and expenditures on advertising. But it has not shown that these numbers make the KÜHL mark strong. It offers no comparison to its competitor brands or evidence from consumers that they recognize the KÜHL mark or make purchases due to the mark. And it provides no evidence showing that its marketing efforts have made consumers aware of the KÜHL mark in the marketplace.

Although the KÜHL mark is conceptually strong, Alfwear has not sufficiently demonstrated its commercial strength.[389] In all, this factor somewhat favors Ibkul.

### iii.    Intent of Alleged Infringer

Ibkul next argues it should be granted summary judgment because it did not intend to infringe on the KÜHL mark. It states that there is no dispute that it was unaware of Alfwear or the KÜHL mark before the creation of the IBKÜL mark.[390] Alfwear disagrees, arguing that

---

[387] Pl. MSJ Opp. 67.
[388] *Affliction Holdings,* 935 F.3d at 1115.
[389] *Water Pik,* 726 F.3d at 1153 ("a mark with conceptual strength may ultimately be weak if its commercial strength is negligible.") (citations omitted).
[390] Def. MSJ 53.

Ibkul's adoption of a mark that is similar to the KÜHL mark creates an inference of intent to infringe.[391]

"The proper focus under this factor 'is whether defendant had the intent to derive benefit from the reputation or goodwill of plaintiff.'"[392] "Proof that a defendant chose a mark with the intent of copying the plaintiff's mark may, standing alone, justify an inference of likelihood of confusion."[393] However, if "undisputed evidence indicates that the defendants did not intend to derive benefits from plaintiff's existing mark, this factor weights against likelihood of confusion."[394] "Under the intent factor, the alleged infringer's intent is measured at the time it 'chose' or 'adopted' its mark."[395] "In analyzing intent, we look to evidence of the 'process of choosing' a mark, not evidence subsequent to its adoption."[396]

Ibkul states that it came up with the IBKÜL mark to convey that its garment's fabric cools the individual wearing it.[397] The mark's use of the "u" with an umlaut was developed by a third-party artist who created the IBKÜL logo.[398] Ibkul points to record evidence that shows its founders first became aware of Alfwear and the KÜHL mark on or after October 31, 2016.[399] This was more than a month after Ibkul filed a trademark application for the stylized IBKÜL mark. Ibkul's CEO has also stated that the first time he became aware of the KÜHL brand was after filing for the IBKÜL trademark.[400]

---

[391] Pl. MSJ Opp. 37.

[392] *King of the Mountain Sports, Inc.*, 185 F.3d at 1091 (quoting *Jordache Enterprises.*, 828 F.2d at 1485).

[393] *Sally Beauty Co.*, 304 F.3d at 973 (citing *Beer Nuts, Inc.*, 711 F.2d at 941).

[394] *King of the Mountain Sports, Inc.*, 185 F.3d at 1092 (quoting *Heartsprings, Inc.* 143 F.3d at 550).

[395] *Hornady Mfg. Co.*, 746 F.3d at 1004 (citing *Water Pik*, 726 F.3d at 1136).

[396] *Id.*

[397] Deposition of Jamie Handler, 44:17–25, ECF No. 128-20, filed Oct. 11, 2024.

[398] *Id.* at 46:2–20.

[399] Second Supplemental Responses to Plaintiff's First Set of Interrogatories to Defendant Ibkul Corp. 5, ECF No. 128-27, filed Oct. 11, 2024.

[400] Deposition of Anurag Gauba 147:1–3, ECF No. 128-19, filed Oct. 11, 2024.

Alfwear counters with evidence that Ibkul was aware of the KÜHL mark before it sold

any goods with the IBKÜL mark.[401] However, Alfwear fails to mention that Ibkul became aware

of the KÜHL mark in 2016 because Ibkul received notice that Alfwear was opposing the IBKÜL

mark.[402] There is no evidence in the record that Ibkul was aware of the KÜHL mark during its

process of choosing the IBKÜL mark or before it filed for trademark protection for the IBKÜL

mark.

Moreover, even if Ibkul was aware of the KÜHL mark, that alone does not establish that

it intended to benefit from an association with the KÜHL brand. Brands can be aware of a senior

mark and not have the requisite intent to cause confusion.[403] And Alfwear supplies no evidence

to show that Ibkul intends to benefit from any association with the KÜHL mark. In all, the record

evidence does not lead to a reasonable inference that Ibkul intended to infringe upon the KÜHL

brand at the time it adopted the IBKÜL mark. Accordingly, this factor weighs in favor of Ibkul.

### iv.    Degree of Care

Ibkul argues that consumers of both KÜHL and IBKÜL branded clothing exercise a high

degree of care in purchasing their products.[404] Alfwear disagrees, arguing that consumers do not

exercise a high degree of care when purchasing athleisure and performance clothing.[405]

---

[401] Responses to Plaintiff's First Set of Requests for Admission to Defendant Ibkul Corp. 5, ECF No. 146-68, filed Nov. 8, 2024.
[402] Deposition of Anurag Gauba 147:1–11, ECF No. 128-19, filed Oct. 11, 2024.
[403] *See Water Pik,* 726 F.3d at 1136 (plaintiff failed to establish requisite intent even where defendant had previously tried to acquire plaintiff because process of choosing junior mark was "innocuous").
[404] Def. MSJ 55–56.
[405] Pl. MSJ Opp. 70.

"Likelihood of confusion is reduced when a buyer exercises a high degree of care in selecting a product."[406] "'Buyers typically exercise little care in the selection of inexpensive items that may be purchased on impulse' and a higher degree of care with expensive items."[407] However, courts should not take a "price-determinative approach," but should "focus 'on the consumer's degree of care'. . . and ask whether the item is one which is commonly 'purchased on an impulse.'"[408] Common and inexpensive items, such as generic hair care products[409] or snacks[410] are bought with a low degree of care, while more expensive and less frequent purchases, such as healthcare products[411] or a ski vacation[412] are made with a high degree of care.

Alfwear does not present any evidence about the degree of care its customers take when purchasing KÜHL products. Instead, it references district court cases that found consumers do not exercise a high degree of care when purchasing athletic apparel.[413] But it fails to address the level of care consumers exercise in purchasing KÜHL outdoor apparel. Alfwear claims that KÜHL is recognized as a "top outdoor clothing brand" that customers have recognized for "product quality and innovation."[414] KÜHL products are sold for roughly one hundred dollars or

---

[406] *Gen. Motors Co. v. Urb. Gorilla, LLC*, No. 2:06-CV-00133 BSJ, 2010 WL 5395065, at *19 (D. Utah 2010) (citing *Heartsprings, Inc.,* 143 F.3d at 557).
[407] *Id.* (quoting *Beer Nuts, Inc. v. Clover Club Foods Co.*, 805 F.2d 920, 926 (10th Cir. 1986)).
[408] *Hornady Mfg. Co.*, 746 F.3d at 1007 (quoting *Sally Beauty Co.*, 304 F.3d at 975).
[409] *Sally Beauty Co.*, 304 F.3d at 964.
[410] *Beer Nuts, Inc.*, 711 F.2d at 941.
[411] *Water Pik*, 726 F.3d at 1136.
[412] *Vail Assocs., Inc.*, 516 F.3d at 872 (10th Cir. 2008).
[413] Pl. MSJ Opp. 70; citing *New Balance Athletics, Inc. v. USA New Bunren Int'l Co. Ltd. LLC*, 424 F. Supp. 3d 334, 348 (D. Del. 2019) (stating that "courts have repeatedly held that buyers of athletic apparel and footwear are not likely to exercise a high degree of care."); *Aime Leon Dore, Inc. v. TASTR. GmbH*, No. 20-CV-934 (MKB), 2021 WL 6797294, at *9 (E.D.N.Y. 2021) (evaluating "sophistication of the relevant consumer group" and finding that clothing at issue was "retail apparel and inexpensive."); *H-D U.S.A., LLC v. SunFrog, LLC*, 311 F. Supp. 3d 1000, 1034 (E.D. Wis. 2018) (stating that "the average retail consumer will not exercise great care and discretion in buying ordinary apparel").
[414] Pl. MSJ Opp. ¶¶ 87, 90.

69

more, with some items retailing for over $300. Alfwear does not persuasively explain why consumers generally would purchase relatively expensive, technical gear on an impulse.[415] It is more likely that most consumers would research and weigh their options before purchasing Alfwear's high-priced, specialized apparel and other gear. Accordingly, this factor favors Ibkul.

### v.    Similarity of Products and Marketing

"The greater the similarity between the products and services, the greater the likelihood of confusion."[416] Courts analyze this factor "by separately considering (1) the similarity of products and (2) the similarity in the manner of marketing the products."[417]

Ibkul argues that it sells "resort-inspired apparel" with clothing "in bright prints and colors with more of a resort or country club fashion style."[418] Ibkul contrasts this with KÜHL clothing, which it argues is "outdoor apparel. . . in muted colors with a hiking, camping and western wear style."[419] In response, Alfwear describes similarities between the products that it argues give them "identical qualities and features."[420]

Record evidence shows substantial overlap between the parties' products. Both parties sell clothing including pants, shirts, jackets, and hats.[421] Both KÜHL and IBKÜL clothing is designed for outdoor wear. Both are classified as athleisure or performance clothing.[422] IBKÜL

---

[415] *Jordache Enterprises,* 828 F.3d at1487 (district court did not commit clear error in holding that "customers are likely to exercise a high degree of care in purchasing clothing that costs between fifteen and sixty dollars.").

[416] *Universal Money Centers, Inc.,* 22 F.3d at 1532 (quoting *Exxon Corp. v. Texas Motor Exch.,* 628 F.2d 500, 505 (5th Cir.1980)).

[417] *Sally Beauty Co.,* 304 F.3d at 974 (citing *Universal Money Centers, Inc.,* 22 F.3d at 1532–33).

[418] *Id.*

[419] *Id.*

[420] Pl. MSJ Opp. 42.

[421] *See* KÜHL Spring 2023 Catalog, ECF No. 130-4, filed Oct. 11, 2024; D. 2023 Spring Catalog ("IBKÜL Catalog"), ECF No. 128-3, filed Oct. 11, 2024.

[422] Jamie Handler Deposition Transcript 94:15-17, ECF No. 138-3, filed Oct. 25, 2024 (stating that Ibkul products fit in an athleisure category "without a doubt."); Deposition of Kevin Boyle 41:17–21 (ECF No. 125-6, filed Oct. 11, 2024 ("KÜHL has been doing athleisure before athleisure ever happened.").

products offer sun-protective, UPF features.[423] Many KÜHL products have similar sun-protective qualities.[424] IBKÜL and KÜHL products are both meant to be comfortable, with quick drying and sweat-wicking features.[425] The parties' products also share a similar look. Many products offered by the parties have similar tailoring and prints and are sold at similar prices.[426] Take, for instance, men's shorts offered by both parties.





KÜHL Short        IBKÜL Short

The KÜHL shorts are advertised as being soft, quick drying, moisture-wicking, and having sun protection.[427] They are sold for $75.[428] The IBKÜL shorts are advertised as being comfortable, quick drying, and moisture-wicking.[429] They are sold for $76.[430] The KÜHL and IBKÜL shorts, like many of the parties' other products, are very similar.

---

[423] D. 2023 Spring Catalog ("IBKÜL Catalog"), ECF No. 128-3, filed Oct. 11, 2024.
[424] KÜHL Spring 2023 Catalog, ECF No. 130-4, filed Oct. 11, 2024.
[425] Id.
[426] Id.
[427] KÜHL Product Page, KUHL 04380, ECF 146-36, filed Nov. 8, 2011.
[428] Id.
[429] IBKÜL Product Page, KUHL 003845, ECF 146-35, filed Nov. 8, 2024.
[430] Id.

Ibkul offers three arguments to counter the evidence presented by Alfwear on the similarity of the products.[431] First, it contends that Ibkul clothing is meant for different activities than Alfwear products. It argues that IBKÜL clothing is designed for activities like golf, tennis, and yoga, while KÜHL clothing has a "hiking, camping and western wear style."[432] Alfwear responds that KÜHL and IBKÜL clothing can both be used for a variety of activities and that its products are used for golf and yoga.[433]

Any differences in the activities the parties' products are intended for are overwhelmed by the similarities between the products. Ibkul does not present any evidence that clothing designed for golf or tennis cannot be used for other outdoor activities. What's more, many IBKÜL products seem intended for daily wear, much like many KÜHL products.[434] And it is not clear that consumers prioritize these activities when purchasing either KÜHL or IBKÜL products such that they would not consider KÜHL and IBKÜL clothing interchangeable. Accordingly, any difference in the activities for which the clothing is worn does not outweigh the clear similarity between KÜHL and IBKÜL clothing.

Ibkul next distinguishes the product's appearances by focusing on IBKÜL's prints and "resort or country club fashion style."[435] Although Ibkul sells clothing with custom prints, at least forty percent of Ibkul's total business comes from solid color clothing.[436] Moreover,

---

[431] Def. MSJ 58. Ibkul relies on sections of the Holt Report and sales representative declarations to make these arguments. The court does not consider these arguments insofar as they rely on information that must be excluded under Rule 37.
[432] *Id.* at 57.
[433] Pl. MSJ Opp. 50.
[434] IBKÜL Product Page, KUHL 003845, ECF 146-35, filed Nov. 8, 2024 ("You can do it all in this short that has it all."); KÜHL Product Page, KUHL 04380, ECF 146-36, filed Nov. 8, 2011 ("Short is designed for working up a sweat in the gym or the great outdoors").
[435] Def. MSJ 57.
[436] Reply Declaration of Anurag Gauba in Support of Defendants' Motion for Summary Judgment 2, ECF No. 165, filed Nov. 24, 2024.

Alfwear also sells clothing with prints and designs.[437] Ibkul's use of patterns on some of its clothing does not overshadow the clear similarities between the parties' products.

Finally, Ibkul argues that the similarities between KÜHL and IBKÜL clothing can be minimized because of differences in the product's fabric components, construction, silhouettes, and features such as pockets and zippers.[438] But the products do not have to be identical in every way. Although the clothing may not be identical, IBKÜL products share many of the same features as KÜHL products. Both parties sell athleisure and performance wear with temperature-regulating features. Their products are sold for similar prices and have substantially overlapping appearances. Some variety in the clothing's construction does not rebut the evidence that the products are, taken as a whole, very similar.

In all, the differences accentuated by Ibkul do not overshadow the clear similarities between the parties' products. Alfwear has introduced record evidence showing substantial overlap in the products' appearance and price. However, this does not end the inquiry. IBKÜL and KÜHL products must also have similar marketing for this factor to weigh in Alfwear's favor.

"In analyzing the similarity in the manner of marketing" courts should consider "whether the parties were competitors in consumer markets."[439] "The possibility of confusion is greatest when products reach the public by the same retail outlet."[440] However, there is no requirement "that the allegedly infringing product be available on the same shelves as the plaintiff's product"

---

[437] KÜHL Spring 2023 Catalog KUHL 001854, KUHL 001861, KUHL 001942, ECF No. 130-4, filed Oct. 11, 2024.
[438] Def. MSJ Reply 42–45.
[439] *Sally Beauty Co.*, 304 F.3d at 974 (citations omitted).
[440] *Beer Nuts, Inc.*, 711 F.2d at 941.

and products sold at entirely separate retailers may still pose a possibility of confusion.[441] The "key is whether the products are marketed to consumers 'in competing retail outlets.'"[442]

Ibkul argues this factor favors it because it sells to retailers that largely do not overlap with Alfwear.[443] It argues that the parties' marketing is different because IBKÜL products are mostly sold in country clubs.[444] Although it is not their main sales channel, Alfwear also sells KÜHL products in country clubs.[445] Alfwear has also identified websites that carry both KÜHL and IBKÜL products.[446] In all, the record shows that KÜHL and IBKÜL products often are sold at competing outdoor clothing retailers.

Alfwear has also produced evidence showing that the parties market their products using similar marketing channels and content.[447] Both KÜHL and IBKÜL products are sold to customers as comfortable and temperature regulating.[448] The parties' websites and catalogs both show individuals wearing their clothing while doing outdoor activities.[449] And the parties both

---

[441] *Sally Beauty Co.*, 304 F.3d at 975 (citing *Paco Rabanne Parfums, S.A. v. Norco Enters., Inc.*, 680 F.2d 891, 893 (2d Cir.1982) (generic hair care product sold only at competing beauty store had a high likelihood of confusion).
[442] *Big Dog Motorcycles, L.L.C.*, 402 F.Supp.2d at 1331 (quoting *Sally Beauty Co.*, 304 F.3d at 975).
[443] Def. MSJ 58. Ibkul's only evidence on the retailers that sell IBKÜL products has been excluded under Rule 37.
[444] Jamie Handler 30(b)(6) Deposition 21:1–2 (stating that seventy five percent of Ibkul's business comes from country clubs).
[445] List of Active Accounts/Customers KUHL 3526, KUHL 3540, KUHL 3545, KUHL 3546, ECF No. 148-16, filed Nov. 8, 2024.
[446] Plaintiff Alfwear Inc.'s Answers to Defendant Ibcool Inc.'s First Set of Interrogatories 6, ECF 148-11, filed Nov. 8, 2024; Nathan Fay 30(b)(6) Deposition 53:1–17, ECF 148-7, filed Nov. 8, 2024 (listing two retailers that sell both parties' goods).
[447] Pl. MSJ Opp. 52.
[448] KÜHL Product Page, KUHL 04380, ECF 146-36, filed Nov. 8, 2011; IBKÜL Product Page, KUHL 003845, ECF 146-35, filed Nov. 8, 2024.
[449] KHLs Website, ECF No. 146-61, filed Nov. 8, 2024; Defendants' Website Regarding Mountains and Layering, ECF No. 146-26, filed Nov. 8, 2024; KÜHL Spring 2023 Catalog, ECF No. 130-4, filed Oct. 11, 2024; D. 2023 Spring Catalog ("IBKÜL Catalog"), ECF No. 128-3, filed Oct. 11, 2024.

market their clothing through online keyword promotions, social media, in-store signage, and trade shows.[450]

Alfwear has produced evidence demonstrating the similarity between KÜHL and IBKÜL products and the way these products are marketed. Accordingly, this factor favors Alfwear.

### vi. Degree of Similarity Between the Competing Marks

The similarity of the marks is the "most important factor" in determining trademark infringement.[451] Courts 'analyze similarity on three levels: 'sight, sound, and meaning.''[452] "[S]imilarities between marks should be given more weight than differences."[453] "Marks should be compared 'as a whole as they are encountered by consumers in the marketplace.'"[454]

Courts must not engage in a side-by-side comparison, but "must determine whether the alleged infringing mark will be confusing to the public when singly presented."[455] "As a result, even if two marks are identical, if they are encountered in different contexts in the real-world marketplace, then the consumer can often easily distinguish between the two products associated with the marks, and any degree of similarity between the marks amounts to very little in terms of confusion."[456] However, "[a] lower degree of similarity is required when the marks are placed on

---

[450] Gauba 30(b)(6) Deposition 132–136 (stating Ibkul sends catalogs, advertises on Facebook, through Google AdWords, email advertising); Fay 30(b)(6) Deposition 30, 83, 101 (stating Alfwear advertises on Facebook and Google, email blasts, and catalogs).
[451] *King of the Mountain Sports, Inc.*, 185 F.3d at 1091.
[452] *Alfwear, Inc. v. Mast-Jaegermeister US, Inc.*, No. 21-4029, 2023 WL 5765891, at *6 (10th Cir. 2023) (citing *King of the Mountain Sports*, Inc., 183 F.3d at 1090).
[453] *Universal Money Centers, Inc.*, 22 F.3d at 1531 (citing *Jordache Enterprises*, 828 F.2d at 1485).
[454] *Water Pik*, 726 F.3d at 1146 (quoting *King of the Mountain Sports*, Inc., 183 F.3d at 1090).
[455] *Universal Money Centers, Inc.*, 22 F.3d at 1531 (quoting *Beer Nuts, Inc.*, 711 F.2d at 940).
[456] *Alfwear, Inc. v. Mast-Jaegermeister US, Inc.*, No. 21-4029, 2023 WL 5765891, at *6 (10th Cir. 2023) (citing *Nautilus Grp., Inc. v. ICON Health & Fitness, Inc.*, 372 F.3d 1330, 1345 (Fed. Cir. 2004)).

closely related goods."[457] "If a consumer encounters two related goods within the same market, that consumer would likely be confused even if the marks were only slightly similar."[458]

Ibkul first argues that the court should not consider any factors beyond visual similarity because Alfwear's CEO stated that he has "no problem with defendants using 'IBCOOL.'"[459] It argues that this brief statement made in Mr. Boyle's deposition has "obviated the need for the court to consider the 'sound' and 'meaning' portions of the test."[460] Alfwear argues that any statements made by Mr. Boyle do not change the standard the court should apply in evaluating the similarity between the parties' marks.[461]

"Deposition testimony does not amend the complaint."[462] The testimony of a Rule 30(b)(6) deponent "does not bind the corporation in the sense of a judicial admission, but is rather evidence that, like any other deposition testimony, can be contradicted and used for impeachment purposes. . . the entity is not irrevocably bound" to what the deponent states during the testimony.[463]

Alfwear has not waived or dismissed any portion of its trademark infringement claims, and Mr. Boyle's single comment in a deposition does not alter the test the court must use to

---

[457] *Affliction Holdings*, 935 F.3d at 1112 (citing *Nautilus Grp., Inc. v. ICON Health & Fitness, Inc.*, 372 F.3d 1330, 1345 (Fed. Cir. 2004)).

[458] *Alfwear, Inc. v. Mast-Jagermeister US, Inc.*, No. 2:12-CV-00936-TC-DBP, 2021 WL 364109, at *3 (D. Utah 2021), *aff'd sub nom. Alfwear, Inc. v. Mast-Jaegermeister US, Inc.*, No. 21-4029, 2023 WL 5765891 (10th Cir. 2023) (citing *Nautilus Grp.*, 372 F.3d at 1345).

[459] Def. MSJ Reply 18.

[460] *Id.*

[461] Pl. MSJ Opp. 33.

[462] *Stepp v. Covance Cent. Lab'y Servs., Inc.*, 931 F.3d 632, 634 (7th Cir. 2019).

[463] *Vehicle Mkt. Rsch., Inc. v. Mitchell Int'l, Inc.*, 839 F.3d 1251, 1261 (10th Cir. 2016) (quoting *S. Wine & Spirits of Am., Inc. v. Div. of Alcohol & Tobacco Control*, 731 F.3d 799, 811 (8th Cir. 2013)); *see also Falcon v. Saint-Veltri*, 23 F. App'x n.3 908, 912 (10th Cir. 2001) (quoting *Kempter v. Hurd*, 713 P.2d 1274, 1279 (Colo.1986)) (judicial admissions are "formal, deliberate declarations which a party or his attorney makes in a judicial proceeding for the purpose of dispensing with proof of formal matters or facts about which there is no real dispute").

evaluate these claims. Mr. Boyle's statements may be used as evidence in the case; however, his statement does not materially alter Alfwear's litigating position. Accordingly, the court evaluates the degree of similarity between the parties' marks in appearance, sound, and meaning.

When comparing marks, courts cannot "focus solely on name similarity" but must also "consider the effect of marketplace presentation, including 'lettering styles, logos and coloring schemes.'"[464] Ibkul argues that the marks are not similar because of their different logos, taglines, and stylization.[465] Alfwear disagrees, arguing that the KÜHL and IBKÜL marks are substantially similar in appearance, sound, and meaning.[466] It contends that the marks both use the phonetic phrase "cool", use a u with an umlaut in a similar typeface, and are presented using similar shades of black, white, and blue.[467]

There are substantial visual similarities between the KÜHL and IBKÜL marks. Both marks use a K and a u with an umlaut to spell "cool." Both marks use a non-serif font and are capitalized. And both marks use, at least partially, white lettering. However, several features distinguish the parties' marks. The KÜHL mark, as presented on its hang tag, features the "Born in the Mountains" line, while the IBKÜL mark highlights Ibkul's temperature regulating fabric. The KÜHL tag features Alfwear's Mountain Logo and directs to kuhl.com, while the IBKÜL tag uses the "smiley face" logo and includes a sun protection rating. Finally, the tags have different back sides. The KÜHL tag features the KÜHL mark and "Mountain Grown, Independently Owned" markings. The IBKÜL mark, on the other hand, says "Stay Cool with Ibkul."

---

[464] *Hornady Mfg. Co.*, 746 F.3d at 1002 (quoting *Heartsprings, Inc.*, 143 F.3d at 555) (also quoting *Universal Money Centers, Inc.*, 22 F.3d at 1531).
[465] Def. MSJ 52.
[466] Pl. MSJ Opp. 33.
[467] *Id.* at 34.

Altogether, the visual similarity between the marks favors Alfwear. Although the hang tags are not identical, their likeness is clear. They use similar colors, and both prominently feature a phonetic equivalent to "cool" spelled using a u with an umlaut. The marks themselves use both use the letters K, U with an umlaut, and L to convince customers that the product is from a "cool" brand.

The marks' visual similarity is amplified by the similarity of the parties' products. As discussed above, the hang tags and other appearances of the parties' marks are tied to their outdoor clothing products. A reasonable jury could find that the similarities between the marks, particularly when seen on the parties' competing outdoor clothing, are substantially similar.

Ibkul next argues that its mark sounds different because IBKÜL has three syllables, while KÜHL has only one syllable.[468] Alfwear contends that the "IB" portion of the IBKÜL mark does not make it dissimilar from the KÜHL mark. It states that the "IB" portion emphasizes the "KÜL" portion without altering the meaning of the mark and suggesting to customers that they will "look and feel 'KÜL' when they purchase 'KÜL' products."[469]

The marks are somewhat distinguishable because of the "IB" portion of the IBKÜL mark, which adds two syllables to the "cool" sound in both marks.[470] However, the marks share the same dominant "cool" sound.[471] A consumer could confuse the marks when discussing the

---

[468] Def. MSJ Reply 26.

[469] *Id.*

[470] *See Elevate Fed. Credit Union*, 67 F.4th at 1078 ("Elevate" and "Elevations" sound different because of syllables, ending sound of marks); *Water Pik*, 726 F.3d at 1156 (holding "SinuCleanse" sounds different than "SinuSense").

[471] *See Affliction Holdings*, 935 F.3d at 1112 (holding that degree of similarity of "Affliction Live Fast" and "Vape Affliction" marks was high without addressing sound); *Darkowl, LLC v. Arkowl LLC*, No. 21-CV-02163-KLM, 2023 WL 4882335, at *16 (D. Colo. 2023) (finding "DarkOwl" and "ArkOwl" sound similar); *Pinterest, Inc. v. Pintrips, Inc.*, 140 F. Supp. 3d 997, 1013–14 (N.D. Cal. 2015) (stating that "[s]light difference in the sound of trademarks will not protect the infringer" and holding that "Pinstrips" sounds like "Pinterest" despite difference in syllables) (citations omitted); *Compliance Sols. Occupational Trainers, Inc. v. Safety Helpers, LLC*, No. 14-CV-00323-REB-KLM, 2014 WL 3672966, at *2 (D. Colo. 2014) ("Compliance Solvers" and "Compliance Solutions" sound similar).

brands and their products, as they feature the same defining sound and are found on similar

outdoor clothing.

Moreover, the addition of "IB" does not alter the marks' meaning. Both marks seem to

imply that the clothing is "cool" in that it is stylish and "cool" because it can regulate

temperature. The similarity between the meanings is amplified by the similarity of the parties'

products. Both parties sell heat-amplifying clothing and sun-protective, cooling clothing.

Given these similarities, a "consumer could plausibly be confused as to a product's origin."[472]

Ibkul again cites the Tenth Circuit's decision in *Alfwear v. Jägermeister*, urging the court

to conclude that Alfwear's clothing is "cool" because it may protect customers from cold

weather.[473] It argues that KÜHL clothing is "cool" because it is meant for cool weather, while

IBKÜL clothing is "cool" because it is meant to keep the person wearing it cool.[474] However, in

*Jägermeister* the parties sold very different products—alcohol and outdoor clothing. Here, the

parties both sell outdoor clothing. The "cool" portion of both marks conveys the temperature-

regulating properties of both KÜHL and IBKÜL clothing.

In all, this factor favors Alfwear. The marks share substantial similarities in sight, sound,

and meaning. The marks are attached to similar products and plausibly convince consumers of

similar qualities. Therefore, this critical factor weighs in favor of Alfwear.

Four of the six infringement factors—evidence of actual confusion, strength of the

contesting mark, intent of the alleged infringer, and degree of care—favor Ibkul. However, the

similarity of the KÜHL and IBKÜL marks, products, and marketing establish a dispute of

---

[472] *Affliction Holdings*, <u>935 F.3d at 1115</u>.
[473] Def. MSJ Reply 28.
[474] *Id.* at 27.

material fact. Ibkul has not shown that no reasonable juror could find a likelihood of confusion between the KÜHL and IBKÜHL marks based on these two factors. Accordingly, its motion for summary judgment on Alfwear's trademark infringement claim is denied.

### C. Trademark Dilution

Ibkul also moves for summary judgment on Alfwear's trademark dilution claim.[475] It argues that the court should bind Alfwear by the district court's holding in *Alfwear, Inc. v. Mast-Jagermeister US, Inc.*, where it determined that the KÜHL mark is not famous.[476] Alfwear argues that this decision considered issues that are not identical to the inquiry in this case, so it should not be applied here.[477]

"To establish a claim for trademark dilution, [a] plaintiff must show that (1) it owns a 'famous' mark and (2) defendants' use has or will cause dilution."[478] A mark is famous "if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner."[479] "A dilution claim can only be maintained if plaintiff's mark was famous before Defendants began their use of their logo."[480]

In *Alfwear, Inc. v. Mast-Jagermeister US, Inc.* the district court evaluated the fame of the KÜHL mark in 2016, when defendant Mast-Jägermeister began using the word "KÜHL" as part of an advertising campaign.[481] The court evaluated Alfwear's evidence on its total sales, retail

---

[475] Def. MSJ 59.
[476] *Id.* at 61.
[477] Pl. MSJ Opp. 72. Alfwear again argues that Ibkul should not be permitted to rely on the Tenth Circuit decision because Ibkul did not disclose this case as a basis for its issue preclusion defense. *Id.* Alfwear does not explain why Ibkul would be required to make this disclosure or provide any other basis for this argument, so the court does not address it further.
[478] *King of the Mountain Sports, Inc. v. Chrysler Corp.*, 968 F. Supp. 568, 577 (D. Colo. 1997), *aff'd*, 185 F.3d 1084 (10th Cir. 1999) (citing 15 U.S.C. § 1125 (c)).
[479] 15 U.S.C. § 1125 (c)(2)(A).
[480] *Poison Spider Bicycles, Inc.* 2018 WL 836364, at *7).
[481] No. 2:12-CV-00936-TC-DBP, 2021 WL 364109, at *2.

partners, advertisements, and celebrities that had worn KÜHL clothing and found the mark was not famous in 2016.[482] It reasoned that the KÜHL mark was not "widely recognized by the general American public" and held that a reasonable juror could not find the mark was famous as part of a dilution claim.[483]

The issue is identical in this case. Crucially, the timeframe for measuring the KÜHL mark's fame is precisely the same; Mast-Jägermeister began using the word KÜHL in 2016, and Ibkul began using the IBKÜL mark in 2016.[484] The *Mast-Jägermeister* court determined that the KÜHL mark was not famous at that that time, based on the same evidence Alfwear has presented in this case.[485]

The other elements of issue preclusion have also been met on Alfwear's trademark dilution claim. The dilution claim in *Mast-Jägermeister* was finally adjudicated after a fair opportunity to litigate, and Alfwear did not appeal this portion of the district court's decision to the Tenth Circuit.[486] Alfwear is the plaintiff in both cases, and the fame of its mark in 2016 is not any different between the two cases.

In sum, all the requirements for non-mutual offensive issue preclusion have been met on this issue, and there is no obvious unfairness to Alfwear in applying the *Mast-Jägermeister* fame finding in this case. Alfwear cannot succeed in its dilution claim without showing its mark was famous in 2016, and its mark was not famous in 2016. Accordingly, Ibkul's motion for summary judgment Alfwear's trademark dilution claim is granted.

---

[482] *Id.* at *9.
[483] *Id.* at *10.
[484] Gauba Dep. 40:9–21; 42:1–7.
[485] Pl. MSJ Opp. 72.
[486] *Alfwear, Inc. v. Mast-Jaegermeister US, Inc.*, No. 21-4029, 2023 WL 5765891, at *3 n.4 (10th Cir. 2023).

81

## ORDER

- Alfwear's Motion to Exclude Krista F. Holt's Expert Report is GRANTED IN PART and DENIED IN PART.[487] Sections IV, V, VIII, and IX of Ms. Holt's report and any related testimony at trial are excluded.

- Ibkul's Motion to Exclude Testimony and Opinions of Plaintiff's Survey Expert Rhonda Harper is DENIED.[488]

- Alfwear's Motion for Partial Summary Judgment is GRANTED IN PART and DENIED IN PART.[489] The motion is GRANTED as to the incontestability of the KÜHL mark and to Ibkul's fair use and statute of limitations defenses. It is DENIED as to Ibkul's issue preclusion defense.

  Ibkul's Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART.[490] The motion is GRANTED as to Alfwear's trademark dilution claim and DENIED as to Alfwear's trademark infringement claims. Alfwear's claims for federal trademark infringement, federal unfair competition, and common law unfair competition remain.

---

[487] ECF No. 120.
[488] ECF No. 127.
[489] ECF No. 123.
[490] ECF No. 126.

Signed May 12, 2025.

BY THE COURT

_____
David Barlow
United States District Judge